## BUSH *v.* LUCAS

No. 81–469.  Argued January 19, 1983—Decided June 13, 1983

STEVENS, J., delivered the opinion for a unanimous Court. MARSHALL, J., filed a concurring opinion, in which BLACKMUN, J., joined, *post*, p. 390.

*William Harvey Elrod, Jr.*, argued the cause and filed briefs for petitioner.

*Deputy Solicitor General Geller* argued the cause for respondent. With him on the brief were *Solicitor General Lee, Assistant Attorney General McGrath, David A. Strauss, Barbara L. Herwig*, and *Wendy M. Keats.** 

JUSTICE STEVENS delivered the opinion of the Court.

Petitioner asks us to authorize a new nonstatutory damages remedy for federal employees whose First Amendment rights are violated by their superiors. Because such claims arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States, we conclude that it would be inappropriate for us to supplement that regulatory scheme with a new judicial remedy.

---

*Briefs of *amici curiae* urging reversal were filed by *Charles B. Wayne* and *Mark H. Lynch* for the American Civil Liberties Union; by *J. Albert Woll, Marsha Berzon, Laurence Gold, Edward J. Hickey, Erick Genser, James Rosa*, and *David Barr* for the American Federation of Labor and Congress of Industrial Organizations et al.; by *John F. Bufe, Lois G. Williams*, and *Michael David Fox* for the National Treasury Employees Union; and by *John C. Keeney, Jr., Joseph M. Hassett*, and *Peter Raven-Hansen* for Representative Schroeder et al.

Petitioner Bush is an aerospace engineer employed at the George C. Marshall Space Flight Center, a major facility operated by the National Aeronautics and Space Administration in Alabama. Respondent Lucas is the Director of the Center. In 1974 the facility was reorganized and petitioner was twice reassigned to new positions. He objected to both reassignments and sought formal review by the Civil Service Commission.[1] In May and June 1975, while some of his administrative appeals were pending, he made a number of public statements, including two televised interviews, that were highly critical of the agency. The news media quoted him as saying that he did not have enough meaningful work to keep him busy, that his job was "a travesty and worthless," and that the taxpayers' money was being spent fraudulently and wastefully at the Center. His statements were reported on local television, in the local newspaper, and in a national press release that appeared in newspapers in at least three other States.[2]

In June 1975 respondent, in response to a reporter's inquiry, stated that he had conducted an investigation and that petitioner's statements regarding his job had "no basis in fact." App. 15. In August 1975 an adverse personnel action was initiated to remove petitioner from his position. Petitioner was charged with "publicly mak[ing] intemperate remarks which were misleading and often false, evidencing a malicious attitude towards Management and generating an environment of sensationalism demeaning to the Government, the National Aeronautics and Space Administration and the personnel of the George C. Marshall Space Flight Center, thereby impeding Government efficiency and econ-

---

[1] The record indicates that petitioner filed two appeals from the first reassignment and three appeals from the second. App. to Pet. for Cert. e-3 to e-4. He asserts that he had previously made unsuccessful attempts within the Center to obtain redress. App. 30.

[2] App. to Pet. for Cert. d-2 to d-3 (memorandum opinion of District Court); id., at e-19 (opinion of Federal Employee Appeals Authority).

omy and adversely affecting public confidence in the Government service." He was also informed that his conduct had undermined morale at the Center and caused disharmony and disaffection among his fellow employees.[3] Petitioner had the opportunity to file a written response and to make an oral presentation to agency officials. Respondent then determined that petitioner's statements were false and misleading and that his conduct would justify removal, but that the lesser penalty of demotion was appropriate for a "first offense." *Ibid.* He approved a reduction in grade from GS–14 to GS–12, which decreased petitioner's annual salary by approximately $9,716.

Petitioner exercised his right to appeal to the Federal Employee Appeals Authority. After a 3-day public hearing, the Authority upheld some of the charges and concluded that the demotion was justified. It specifically determined that a number of petitioner's public statements were misleading and that, for three reasons, they "exceeded the bounds of expression protected by the First Amendment." First, petitioner's statements did not stem from public interest, but from his desire to have his position abolished so that he could take early retirement and go to law school. Second, the statements conveyed the erroneous impression that the agency was deliberately wasting public funds, thus discrediting the agency and its employees. Third, there was no legitimate public interest to be served by abolishing petitioner's position.[4]

Two years after the Appeals Authority's decision, petitioner requested the Civil Service Commission's Appeals Review Board to reopen the proceeding. The Board reexamined petitioner's First Amendment claim and, after making a detailed review of the record and the applicable authorities, applied the balancing test articulated in *Pickering* v. *Board*

---

[3] *Id.*, at f–2 to f–3, e–19, e–7.

[4] *Id.*, at e–38 to e–39. Petitioner could have obtained judicial review of the Authority's determination by filing suit in a federal district court or in the United States Court of Claims, but did not do so.

*of Education*, 391 U. S. 563 (1968). On the one hand, it acknowledged the evidence tending to show that petitioner's motive might have been personal gain, and the evidence that his statements caused some disruption of the agency's day-to-day routine. On the other hand, it noted that society as well as the individual had an interest in free speech, including "a right to disclosure of information about how tax dollars are spent and about the functioning of government apparatus, an interest in the promotion of the efficiency of the government, and in the maintenance of an atmosphere of freedom of expression by the scientists and engineers who are responsible for the planning and implementation of the nation's space program." Because petitioner's statements, though somewhat exaggerated, "were not wholly without truth, they properly stimulated public debate." Thus the nature and extent of proven disruption to the agency's operations did not "justify abrogation of the exercise of free speech."[5] The Board recommended that petitioner be restored to his former position, retroactively to November 30, 1975, and that he receive backpay. That recommendation was accepted. Petitioner received approximately $30,000 in backpay.

While his administrative appeal was pending, petitioner filed an action against respondent in state court in Alabama seeking to recover damages for defamation and violation of his constitutional rights. Respondent removed the lawsuit to the United States District Court for the Northern District of Alabama, which granted respondent's motion for summary judgment. It held, first, that the defamation claim could not be maintained because, under *Barr* v. *Matteo*, 360 U. S. 564 (1959), respondent was absolutely immune from liability for damages for defamation; and second, that petitioner's demotion was not a constitutional deprivation for which a damages action could be maintained.[6] The United States Court of Appeals for the Fifth Circuit affirmed. 598 F. 2d 958 (1979).

---

[5] *Id.*, at f–23 to f–25.

[6] *Id.*, at d–2 to d–17.

We vacated that court's judgment, 446 U. S. 914 (1980), and directed that it reconsider the case in the light of our intervening decision in *Carlson* v. *Green*, 446 U. S. 14 (1980). The Court of Appeals again affirmed the judgment against petitioner. It adhered to its previous conclusion that "plaintiff had no cause of action for damages under the First Amendment for retaliatory demotion in view of the available remedies under the Civil Service Commission regulations." 647 F. 2d 573, 574 (1981). It explained that the relationship between the Federal Government and its civil service employees was a special factor counselling against the judicial recognition of a damages remedy under the Constitution in this context.

We assume for purposes of decision that petitioner's First Amendment rights were violated by the adverse personnel action.[7] We also assume that, as petitioner asserts, civil service remedies were not as effective as an individual damages remedy[8] and did not fully compensate him for the harm he suffered.[9] Two further propositions are undisputed.

---

[7] Competent decisionmakers may reasonably disagree about the merits of petitioner's First Amendment claim. Compare the opinion of the District Court, App. D to Pet. for Cert., and the opinion of the Atlanta Field Office of the Federal Employees Appeal Authority issued on August 12, 1976, App. E, both rejecting petitioner's claims, with the opinion of the Appeals Review Board issued on July 14, 1978, App. F, finding that the First Amendment had been violated. This question is not before us.

[8] See *Carlson* v. *Green*, 446 U. S. 14, 20–23 (1980) (factors making Federal Tort Claims Act recovery less "effective" than an action under the Constitution to recover damages against the individual official). Petitioner contends that, unlike a damages remedy against respondent individually, civil service remedies against the Government do not provide for punitive damages or a jury trial and do not adequately deter the unconstitutional exercise of authority by supervisors. Brief for Petitioner 27–29.

[9] His attorney's fees were not paid by the Government, and he claims to have suffered uncompensated emotional and dignitary harms. *Id.*, at 24–26. In light of our disposition of this case, we do not need to decide whether such costs could be recovered as compensation in an action brought directly under the Constitution.

Congress has not expressly authorized the damages remedy that petitioner asks us to provide. On the other hand, Congress has not expressly precluded the creation of such a remedy by declaring that existing statutes provide the exclusive mode of redress.

Thus, we assume, a federal right has been violated and Congress has provided a less than complete remedy for the wrong. If we were writing on a clean slate, we might answer the question whether to supplement the statutory scheme in either of two quite simple ways. We might adopt the common-law approach to the judicial recognition of new causes of action and hold that it is the province of the judiciary to fashion an adequate remedy for every wrong that can be proved in a case over which a court has jurisdiction.[10] Or we might start from the premise that federal courts are courts of limited jurisdiction whose remedial powers do not extend beyond the granting of relief expressly authorized by Congress.[11] Under the former approach, petitioner would obviously prevail; under the latter, it would be equally clear that he would lose.

Our prior cases, although sometimes emphasizing one approach and sometimes the other, have unequivocally rejected both extremes. They establish our power to grant relief that is not expressly authorized by statute, but they also remind us that such power is to be exercised in the light of relevant policy determinations made by the Congress. We

---

[10] In *Marbury* v. *Madison*, 1 Cranch 137, 163 (1803), Chief Justice Marshall invoked the authority of Blackstone's Commentaries in support of this proposition. Blackstone had written: "[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit, or action at law, whenever that right is invaded. . . . [I]t is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress." 3 Commentaries *23, *109.

[11] See *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 428 (1971) (Black, J., dissenting).

therefore first review some of the cases establishing our power to remedy violations of the Constitution and then consider the bearing of the existing statutory scheme on the precise issue presented by this case.

I

The federal courts' power to grant relief not expressly authorized by Congress is firmly established. Under 28 U. S. C. § 1331, the federal courts have jurisdiction to decide all cases "aris[ing] under the Constitution, laws, or treaties of the United States." This jurisdictional grant provides not only the authority to decide whether a cause of action is stated by a plaintiff's claim that he has been injured by a violation of the Constitution, *Bell* v. *Hood,* 327 U. S. 678, 684 (1946), but also the authority to choose among available judicial remedies in order to vindicate constitutional rights. This Court has fashioned a wide variety of nonstatutory remedies for violations of the Constitution by federal and state officials.[12] The cases most relevant to the problem before us are those in which the Court has held that the Constitution itself supports a private cause of action for damages against a federal official. *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971); *Davis* v. *Passman,* 442 U. S. 228 (1979); *Carlson* v. *Green, supra.*

---

[12] See, *e. g., United States* v. *Lee,* 106 U. S. 196 (1882) (ejectment action against federal officers to enforce Takings Clause of Fifth Amendment); *Wiley* v. *Sinkler,* 179 U. S. 58, 64–65 (1900) (damages against state officer for denying plaintiff's right to vote in federal election); *Ex parte Young,* 209 U. S. 123 (1908) (injunctive relief against state official for violation of Fourteenth Amendment); *Weeks* v. *United States,* 232 U. S. 383, 398 (1914) (exclusion in federal criminal case of evidence seized in violation of Fourth Amendment); *Jacobs* v. *United States,* 290 U. S. 13, 16 (1933) (award of interest as well as principal in just compensation claim founded on the Fifth Amendment); *Swann* v. *Charlotte-Mecklenburg Bd. of Education,* 402 U. S. 1, 15–16 (1971) (school busing to remedy unconstitutional racial segregation). See generally Hill, Constitutional Remedies, 69 Colum. L. Rev. 1109, 1124–1127 (1969).

In *Bivens* the plaintiff alleged that federal agents, without a warrant or probable cause, had arrested him and searched his home in a manner causing him great humiliation, embarrassment, and mental suffering. He claimed damages on the theory that the alleged violation of the Fourth Amendment provided an independent basis for relief. The Court upheld the sufficiency of his complaint, rejecting the argument that a state tort action in trespass provided the only appropriate judicial remedy. The Court explained why the absence of a federal statutory basis for the cause of action was not an obstacle to the award of damages:

"That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition. Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty. See *Nixon* v. *Condon*, 286 U. S. 73 (1932); *Nixon* v. *Herndon*, 273 U. S. 536, 540 (1927); *Swafford* v. *Templeton*, 185 U. S. 487 (1902); *Wiley* v. *Sinkler*, 179 U. S. 58 (1900); J. Landynski, Search and Seizure and the Supreme Court 28 *et seq.* (1966); N. Lasson, History and Development of the Fourth Amendment to the United States Constitution 43 *et seq.* (1937); Katz, The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in *Bell* v. *Hood*, 117 U. Pa. L. Rev. 1, 8–33 (1968); cf. *West* v. *Cabell*, 153 U. S. 78 (1894); *Lammon* v. *Feusier*, 111 U. S. 17 (1884). Of course, the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation. But 'it is . . . well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.' *Bell* v. *Hood*, 327 U. S., at 684 (footnote omitted). The present case involves no special factors counselling hesitation in the absence of affirma-

tive action by Congress. We are not dealing with a question of 'federal fiscal policy,' as in *United States v. Standard Oil Co.*, 332 U. S. 301, 311 (1947)." 403 U. S., at 395–396.

The Court further noted that there was "no explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress." *Id.*, at 397.

In his separate opinion concurring in the judgment, Justice Harlan also thought it clear that the power to authorize damages as a remedy for the vindication of a federal constitutional right had not been placed by the Constitution itself exclusively in Congress' hands. *Id.*, at 401–402. Instead, he reasoned, the real question did not relate to "whether the federal courts have the power to afford one type of remedy as opposed to the other, but rather to the criteria which should govern the exercise of our power." *Id.*, at 406. In resolving that question he suggested that "the range of policy considerations we may take into account is at least as broad as the range of those a legislature would consider with respect to an express[ed] statutory authorization of a traditional remedy." *Id.*, at 407. After weighing the relevant policies he agreed with the Court's conclusion that the Government had not advanced any substantial policy consideration against recognizing a federal cause of action for violation of Fourth Amendment rights by federal officials.

In *Davis* v. *Passman, supra*, the petitioner, former deputy administrative assistant to a Member of Congress, alleged that she had been discharged because of her sex, in violation of her constitutional right to the equal protection of the laws. We held that the Due Process Clause of the Fifth Amendment gave her a federal constitutional right to be free from official discrimination and that she had alleged a federal cause

of action. In reaching the conclusion that an award of damages would be an appropriate remedy, we emphasized the fact that no other alternative form of judicial relief was available.[13] The Court also was persuaded that the special concerns which would ordinarily militate against allowing recovery from a legislator were fully reflected in respondent's affirmative defense based on the Speech or Debate Clause of the Constitution. *Id.*, at 246. We noted the absence of any explicit congressional declaration that persons in petitioner's position may not recover damages from those responsible for their injury. *Id.*, at 246–247.

*Carlson* v. *Green*, 446 U. S. 14 (1980), involved a claim that a federal prisoner's Eighth Amendment rights had been violated. The prisoner's mother brought suit on behalf of her son's estate, alleging that federal prison officials were responsible for his death because they had violated their constitutional duty to provide him with proper medical care after he suffered a severe asthmatic attack. Unlike *Bivens* and *Davis*, the *Green* case was one in which Congress had provided a remedy, under the Federal Tort Claims Act, against the United States for the alleged wrong. 28 U. S. C. § 2671 *et seq.* As is true in this case, that remedy was not as completely effective as a *Bivens*-type action based directly on the Constitution.

The Court acknowledged that a *Bivens* action could be defeated in two situations, but found that neither was present. First, the Court could discern "'no special factors counselling hesitation in the absence of affirmative action by Congress.'" 446 U. S., at 18–19, citing *Bivens*, 403 U. S., at 396, and *Davis, supra,* at 245. Second, there was no congressional

---

[13] "Moreover, since respondent is no longer a Congressman, see n. 1, *supra*, equitable relief in the form of reinstatement would be unavailing. And there are available no other alternative forms of judicial relief. For Davis, as for Bivens, 'it is damages or nothing.' *Bivens, supra,* at 410 (Harlan, J., concurring in judgment)." 442 U. S., at 245.

determination foreclosing the damages claim and making the Federal Tort Claims Act exclusive. 446 U. S., at 19, and n. 5. No statute expressly declared the FTCA remedy to be a substitute for a *Bivens* action; indeed, the legislative history of the 1974 amendments to the FTCA "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." 446 U. S., at 19–20.

This much is established by our prior cases. The federal courts' statutory jurisdiction to decide federal questions confers adequate power to award damages to the victim of a constitutional violation. When Congress provides an alternative remedy, it may, of course, indicate its intent, by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself, that the courts' power should not be exercised. In the absence of such a congressional directive, the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.

Congress has not resolved the question presented by this case by expressly denying petitioner the judicial remedy he seeks or by providing him with an equally effective substitute.[14] There is, however, a good deal of history that is relevant to the question whether a federal employee's attempt to recover damages from his superior for violation of his First Amendment rights involves any "special factors counselling hesitation." When those words were first used in *Bivens, supra,* at 396, we illustrated our meaning by referring to

---

[14] We need not reach the question whether the Constitution itself requires a judicially fashioned damages remedy in the absence of any other remedy to vindicate the underlying right, unless there is an express textual command to the contrary. Cf. *Davis* v. *Passman,* 442 U. S. 228, 246 (1979). The existing civil service remedies for a demotion in retaliation for protected speech are clearly constitutionally adequate. See *infra,* at 386–388.

*United States* v. *Standard Oil Co.*, 332 U. S. 301, 311, 316 (1947), and *United States* v. *Gilman,* 347 U. S. 507 (1954).

In the *Standard Oil* case the Court had been asked to authorize a new damages remedy for the Government against a tortfeasor who had injured a soldier, imposing hospital expenses on the Government and depriving it of his services. Although, as Justice Jackson properly noted in dissent, the allowance of recovery would not have involved any usurpation of legislative power, 332 U. S., at 318, the Court nevertheless concluded that Congress as "the custodian of the national purse" should make the necessary determination of federal fiscal policy.[15] The Court refused to create a damages remedy, which would be "the instrument for determining and establishing the federal fiscal and regulatory policies which the Government's executive arm thinks should prevail in a situation not covered by traditionally established liabilities." *Id.,* at 314.

Similarly, in *Gilman,* the Court applied the *Standard Oil* rationale to reject the Government's attempt to recover indemnity from one of its employees after having been held liable under the FTCA for the employee's negligence. As the Court noted: "The relations between the United States and its employees have presented a myriad of problems with which the Congress over the years has dealt. . . . Government employment gives rise to policy questions of great im-

---

[15] "Whatever the merits of the policy, its conversion into law is a proper subject for congressional action, not for any creative power of ours. Congress, not this Court or the other federal courts, is the custodian of the national purse. By the same token it is the primary and most often the exclusive arbiter of federal fiscal affairs. And these comprehend, as we have said, securing the treasury or the government against financial losses however inflicted, including requiring reimbursement for injuries creating them, as well as filling the treasury itself." 332 U. S., at 314–315.

The Court further noted that the type of harm for which the Executive sought judicial redress was not new, and that Congress presumably knew of it but had not exercised its undoubted power to authorize a damages action. *Id.,* at 315–316.

port, both to the employees and to the Executive and Legislative Branches." 347 U. S., at 509. The decision regarding indemnity involved questions of employee discipline and morale, fiscal policy, and the efficiency of the federal service. Hence, the Court wrote, the reasons for deferring to congressional policy determinations were even more compelling than in *Standard Oil*.

> "Here a complex of relations between federal agencies and their staffs is involved. Moreover, the claim now asserted, though the product of a law Congress passed, is a matter on which Congress has not taken a position. It presents questions of policy on which Congress has not spoken. The selection of that policy which is most advantageous to the whole involves a host of considerations that must be weighed and appraised. That function is more appropriately for those who write the laws, rather than for those who interpret them." 347 U. S., at 511–513.

The special factors counselling hesitation in the creation of a new remedy in *Standard Oil* and *Gilman* did not concern the merits of the particular remedy that was sought. Rather, they related to the question of who should decide whether such a remedy should be provided. We should therefore begin by considering whether there are reasons for allowing Congress to prescribe the scope of relief that is made available to federal employees whose First Amendment rights have been violated by their supervisors.

## II

Unlike *Standard Oil* and *Gilman*, this case concerns a claim that a constitutional right has been violated. Nevertheless, just as those cases involved "federal fiscal policy" and the relations between the Government and its employees, the ultimate question on the merits in this case may appropriately be characterized as one of "federal personnel

policy." When a federal civil servant is the victim of a retaliatory demotion or discharge because he has exercised his First Amendment rights, what legal remedies are available to him?

The answer to that question has changed dramatically over the years. Originally the answer was entirely a matter of Executive discretion. During the era of the patronage system that prevailed in the Federal Government prior to the enactment of the Pendleton Act in 1883, 22 Stat. 403, the federal employee had no legal protection against political retaliation. Indeed, the exercise of the First Amendment right to support a political candidate opposing the party in office would routinely have provided an accepted basis for discharge.[16] During the past century, however, the job security of federal employees has steadily increased.

In the Pendleton Act Congress created the Civil Service Commission and provided for the selection of federal civil servants on a merit basis by competitive examination. Although the statute did not address the question of removals in general,[17] it provided that no employee in the public service could be required to contribute to any political fund or fired

---

[16] The Report of the Committee on Civil Service and Retrenchment submitted by Senator Pendleton on May 15, 1882, contained a vivid description of the patronage system, reading in part as follows:

"The fact is confessed by all observers and commended by some that 'to the victors belong the spoils;' that with each new administration comes the business of distributing patronage among its friends. . . . [The President] is to do what some predecessor of his has left undone, or to undo what others before him have done; to put this man up and that man down, as the system of political rewards and punishments shall seem to him to demand." S. Rep. No. 576, 47th Cong., 1st Sess., 2 (1882).

See generally House Committee on Post Office and Civil Service, History of Civil Service Merit Systems of the United States and Selected Foreign Countries, 94th Cong., 2d Sess., 26–173 (1976).

[17] See S. Rep. No. 576, *supra* n. 16, at 9; cf. H. R. Rep. No. 1826, 47th Cong., 2d Sess., 1–2 (1882) (rejected provisions of House bill permitting removals only for cause).

for refusing to do so, and it prohibited officers from attempting to influence or coerce the political actions of others.[18]

Congressional attention to the problem of politically motivated removals was again prompted by the issuance of Executive Orders by Presidents Roosevelt and Taft that forbade federal employees to communicate directly with Congress without the permission of their supervisors.[19] These "gag

---

[18] Section 13 provided:

"No officer or employee of the United States mentioned in this act shall discharge, or promote, or degrade, or in manner change the official rank or compensation of any other officer or employee, or promise or threaten so to do, for giving or withholding or neglecting to make any contribution of money or other valuable thing for any political purpose." 22 Stat. 407.

Other sections made it unlawful for Government employees to solicit political contributions from, and to give such contributions to, other Government employees, §§ 11, 14, and to receive any political contributions on Government premises, § 12. Section 2 required the Civil Service Commission to promulgate rules providing, *inter alia*, "that no person in the public service is for that reason under any obligations to contribute to any political fund, or to render any political service, and that he will not be removed or otherwise prejudiced for refusing to do so," and also "that no person in said service has any right to use his official authority or influence to coerce the political action of any person or body." 22 Stat. 404. See 5 U. S. C. § 2302(b)(3) (1982 ed.); 5 U. S. C. §§ 7321–7323.

[19] In 1906 President Roosevelt issued Executive Order No. 1142, which provided:

"All officers and employees of the United States of every description, serving in or under any of the Executive Departments or independent Government establishments, and whether so serving in or out of Washington, are hereby forbidden, either directly or indirectly, individually or through associations, to solicit an increase of pay or to influence or attempt to influence in their own interest any other legislation whatever, either before Congress or its committees, or in any way save through the heads of the Departments or independent Government establishments in or under which they serve, on penalty of dismissal from the Government service. Theodore Roosevelt."

President Taft issued another Order, Executive Order No. 1514, in 1909:

"It is hereby ordered that no bureau, office, or division chief, or subordinate in any department of the Government, and no officer of the Army or Navy or Marine Corps stationed in Washington, shall apply to either House of Congress, or to any committee of either House of Congress, or to

orders," enforced by dismissal, were cited by several legislators as the reason for enacting the Lloyd-La Follette Act in 1912, 37 Stat. 539, 555, § 6.[20]  That statute provided that "no person in the classified civil service of the United States shall be removed therefrom except for such cause as will promote the efficiency of said service and for reasons given in writing . . . ."[21]  Moreover, it explicitly guaranteed that the right of civil servants "to furnish information to either House of Congress, or to any committee or member thereof, shall not be denied or interfered with."[22]  As the House Report ex-

any Member of Congress, for legislation or for appropriations, or for congressional action of any kind, except with the consent and knowledge of the head of the department; nor shall any such person respond to any request for information from either House of Congress, or any committee of either House of Congress, or any member of Congress, except through, or as authorized by, the head of his department.  William H. Taft."

See 48 Cong. Rec. 4513, 5223, 5634, 5635, 10673, 10729–10730 (1912).

[20] See *id.*, at 4513 (remarks of Rep. Gregg) ("[I]t is for the purpose of wiping out the existence of this despicable 'gag rule' that this provision is inserted.  The rule is unjust, unfair, and against the provisions of the Constitution of the United States, which provides for the right of appeal and the right of free speech to all its citizens").  A number of the bill's proponents asserted that the gag rule violated the First Amendment rights of civil servants.  See, *e. g., id.*, at 4653 (remarks of Rep. Calder); *id.*, at 4738 (remarks of Rep. Blackmon); *id.*, at 5201 (remarks of Rep. Prouty); *id.*, at 5223 (remarks of Rep. O'Shaunessy); *id.*, at 5634 (remarks of Rep. Lloyd); *id.*, at 5637–5638 (remarks of Rep. Wilson); *id.*, at 10671 (remarks of Sen. Ashurst); *id.*, at 10673 (remarks of Sen. Reed); *id.*, at 10793 (remarks of Sen. Smith); *id.*, at 10799 (remarks of Sen. La Follette).

[21] The statute also required notice and reasons and an opportunity for the employee to answer the charges in writing with supporting affidavits.  These requirements had previously been adopted by President McKinley in an Executive Order issued in 1897, but they were not judicially enforceable.  History of Civil Service Merit Systems, *supra* n. 16, at 202–203.

[22] This provision was accompanied by a more specific guarantee that membership in any independent association of postal employees seeking improvements in wages, hours, and working conditions, or the presentation to Congress of any grievance, "shall not constitute or be cause for reduction in rank or compensation or removal of such person or groups of persons from said service."

plained, this legislation was intended "to protect employees against oppression and in the right of free speech and the right to consult their representatives."[23]   In enacting the Lloyd-La Follette Act, Congress weighed the competing policy considerations and concluded that efficient management of Government operations did not preclude the extension of free speech rights to Government employees.[24]

---

[23] H. R. Rep. No. 388, 62d Cong., 2d Sess., 7 (1912).

[24] Members of the House, which originated § 6, suggested that it would improve the efficiency and morale of the civil service.   "It will do away with the discontent and suspicion which now exists among the employees and will restore that confidence which is necessary to get the best results from the employees."   48 Cong. Rec. 4654 (1912) (remarks of Rep. Calder); see id., at 5635 (remarks of Rep. Lloyd).

The Senate Committee initially took a different position, urging in its Report that the relevant language, see id., at 10732 (House version) be omitted entirely:

"As to the last clause in section 6, it is the view of the committee that all citizens have a constitutional right as such to present their grievances to Congress or Members thereof.   But governmental employees occupy a position relative to the Government different from that of ordinary citizens.   Upon questions of interest to them as citizens, governmental employees have a right to petition Congress direct.   A different rule should prevail with regard to their presentation of grievances connected with their relation to the Government as employees.   In that respect good discipline and the efficiency of the service requires that they present their grievances through the proper administrative channels."   S. Rep. No. 955, 62d Cong., 2d Sess., 21 (1912).

As Senator Bourne explained, "it was believed by the committee that to recognize the right of the individual employee to go over the head of his superior and go to Members of Congress on matters appertaining to his own particular grievances, or for his own selfish interest, would be detrimental to the service itself; that it would absolutely destroy the discipline necessary for good service."   48 Cong. Rec. 10676 (1912).

This view did not prevail.   After extended discussion in floor debate concerning the right to organize and the right to present grievances to Congress, id., at 10671–10677, 10728–10733, 10792–10804, the Committee offered and the Senate approved a compromise amendment to the House version—guaranteeing both rights at least in part—which was subsequently enacted into law.   Id., at 10804; 37 Stat. 555.

In the ensuing years, repeated consideration of the conflicting interests involved in providing job security, protecting the right to speak freely, and maintaining discipline and efficiency in the federal work force gave rise to additional legislation,[25] various Executive Orders,[26] and the promulgation of detailed regulations by the Civil Service Commission.[27] Federal civil servants are now protected by an elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by supervisors and procedures—administrative and judicial—by which improper action may be redressed. They apply to a multitude of personnel decisions that are made daily by federal agencies.[28]

---

[25] Among the most significant are the Veterans Preference Act of 1944, 58 Stat. 390 (protecting veterans in federal employment by extending the 1912 Act's procedural and substantive protections to adverse actions other than removals, and adding the right to respond orally and to appeal to the Civil Service Commission); the Back Pay Act of 1948, 62 Stat. 354 (extending the protections against removal contained in the 1912 Act to all employees who were suspended without pay; permitting backpay awards to certain categories of employees who were improperly removed or suspended and to victims of improper reductions in force); the Back Pay Act of 1966, 81 Stat. 203 (extending the right to backpay and lost benefits to every employee affected by a personnel action subsequently found to be unjustified); and the Civil Service Reform Act of 1978, 92 Stat. 1134 (shifting adjudicative functions of the Civil Service Commission to the Merit Systems Protection Board, modifying administrative appeals procedures, and providing new protections for so-called "whistleblowers").

[26] Exec. Order No. 10988, § 14, 3 CFR 521 (1959–1963 Comp.), and Exec. Order No. 11491, § 22, 3 CFR 861 (1966–1970 Comp.), printed in note following 5 U. S. C. § 7301, gave all employees in the competitive service the right to appeal adverse actions to the Civil Service Commission, and made the administrative remedy applicable to adverse personnel actions other than removal and suspension without pay.

[27] See 5 CFR §§ 752, 772 (1975).

[28] Not all personnel actions are covered by this system. For example, there are no provisions for appeal of either suspensions for 14 days or less, 5 U. S. C. § 7503 (1982 ed.), or adverse actions against probationary employees, § 7511. In addition, certain actions by supervisors against federal employees, such as wiretapping, warrantless searches, or uncompensated takings, would not be defined as "personnel actions" within the statutory scheme.

Constitutional challenges to agency action, such as the First Amendment claims raised by petitioner, are fully cognizable within this system. As the record in this case demonstrates, the Government's comprehensive scheme is costly to administer, but it provides meaningful remedies for employees who may have been unfairly disciplined for making critical comments about their agencies.[29]

A federal employee in the competitive service may be removed or demoted "only for such cause as will promote the efficiency of the service."[30] The regulations applicable at the time of petitioner's demotion in 1975,[31] which are substantially similar to those now in effect, required that an employee be given 30 days' written notice of a proposed discharge, suspension, or demotion, accompanied by the agency's reasons and a copy of the charges. The employee then had the right to examine all disclosable materials that formed the basis of the proposed action, 5 CFR § 752.202(a) (1975),

---

[29] Petitioner received retroactive reinstatement and $30,000 in backpay. An empirical study found that approximately one quarter of the adverse actions in the federal civil service were contested. Merrill, Procedures for Adverse Actions Against Federal Employees, 59 Va. L. Rev. 196, 198–199 (1973). In 1970, agency appeals succeeded in 20% of removal cases and 24% of demotion cases. Before the Civil Service Commission, 47% of those employees who appealed demotions and 24% of those who contested removal were successful. Id., at 204, n. 35.

[30] Prior to the enactment of the Civil Service Reform Act of 1978, this protection was accorded in part by statute, 5 U. S. C. § 7501(a) (removals and suspensions without pay of non-preference-eligible employees); § 7512(a) (removals, suspensions without pay, reductions in grade or pay, and other adverse actions against preference-eligible employees), and in part by Executive Orders, see n. 26, supra, implemented in Civil Service Commission regulations, 5 CFR §§ 752.104(a), 752.201 (1975) (adverse actions, including reductions in grade or pay, against covered employees, including non-preference-eligibles). The 1978 amendments retained the general rule, 5 U. S. C. § 7513(a) (1982 ed.), and supplemented it by specifying certain "prohibited personnel practices." § 2302.

[31] Various aspects of the regulations discussed in text were added at different times. See generally Merrill, supra n. 29, at 214–218.

the right to answer the charges with a statement and supporting affidavits, and the right to make an oral nonevidentiary presentation to an agency official. § 752.202(b).[32] The regulations required that the final agency decision be made by an official higher in rank than the official who proposed the adverse action, § 752.202(f). The employee was entitled to notification in writing stating which of the initial reasons had been sustained. *Ibid.;* 5 U. S. C. § 7501(b)(4).

The next step was a right to appeal to the Civil Service Commission's Federal Employee Appeals Authority. 5 CFR §§ 752.203, 772.101 (1975).[33] The Appeals Authority was required to hold a trial-type hearing at which the employee could present witnesses, cross-examine the agency's witnesses, and secure the attendance of agency officials, § 772.307(c),[34] and then to render a written decision, § 772.-309(a). An adverse decision by the FEAA was judicially reviewable in either federal district court or the Court of Claims.[35] In addition, the employee had the right to ask

---

[32] Under the statute, before and after the 1978 amendments, the agency has the discretionary authority to provide an evidentiary hearing. 5 U. S. C. § 7501(b); 5 U. S. C. § 7513(c) (1982 ed.); see 5 CFR § 752.404(g) (1983). As amended in 1978, the statute gives the employee the right to representation by an attorney or other person. 5 U. S. C. § 7513(b)(3) (1982 ed.); see 5 CFR § 752.404(e) (1983).

[33] The 1978 Civil Service Reform Act gave the Commission's adjudicative functions to the Merit Systems Protection Board (MSPB). 5 U. S. C. §§ 1205, 7543(d), 7701 (1982 ed.).

[34] The Commission's regulations did not specify which party carried the burdens of production and persuasion. Nevertheless, participants in the process and reviewing courts assumed that the burden was on the agency to prove that the adverse action was justified. Merrill, *supra* n. 29, at 251; Johnson & Stoll; Judicial Review of Federal Employee Dismissals and Other Adverse Actions, 57 Cornell L. Rev. 178, 192–193 (1972).

[35] Under the law now in effect, the United States Court of Appeals for the Federal Circuit has exclusive jurisdiction over appeals from the MSPB. 5 U. S. C. § 7703 (1982 ed.); Federal Courts Improvement Act of 1982, § 127(a), Pub. L. 97–164, 96 Stat. 37, 28 U. S. C. § 1295 (1982 ed.).

the Commission's Appeals Review Board to reopen an adverse decision by the FEAA.  § 772.310.

If the employee prevailed in the administrative process or upon judicial review, he was entitled to reinstatement with retroactive seniority.  § 752.402.  He also had a right to full backpay, including credit for periodic within-grade or step increases and general pay raises during the relevant period, allowances, differentials, and accumulated leave.  § 550.803. Congress intended that these remedies would put the employee "in the same position he would have been in had the unjustified or erroneous personnel action not taken place." [36]

Given the history of the development of civil service remedies and the comprehensive nature of the remedies currently available, it is clear that the question we confront today is quite different from the typical remedial issue confronted by a common-law court.  The question is not what remedy the court should provide for a wrong that would otherwise go unredressed.  It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue.  That question obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff.  The policy judgment should be informed by a thorough understanding of the existing regulatory structure and the respective costs and benefits that would result from the addition of another remedy for violations of employees' First Amendment rights.

The costs associated with the review of disciplinary decisions are already significant—not only in monetary terms, but also in the time and energy of managerial personnel who must defend their decisions.  Respondent argues that supervisory personnel are already more hesitant than they should be in administering discipline, because the review that en-

---

[36] S. Rep. No. 1062, 89th Cong., 2d Sess., 1 (1966).

sues inevitably makes the performance of their regular duties more difficult. Brief for Respondent 37–41. Whether or not this assessment is accurate, it is quite probable that if management personnel face the added risk of personal liability for decisions that they believe to be a correct response to improper criticism of the agency, they would be deterred from imposing discipline in future cases. In all events, Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service. Not only has Congress developed considerable familiarity with balancing governmental efficiency and the rights of employees, but it also may inform itself through factfinding procedures such as hearings that are not available to the courts.

Nor is there any reason to discount Congress' ability to make an evenhanded assessment of the desirability of creating a new remedy for federal employees who have been demoted or discharged for expressing controversial views. Congress has a special interest in informing itself about the efficiency and morale of the Executive Branch. In the past it has demonstrated its awareness that lower-level Government employees are a valuable source of information, and that supervisors might improperly attempt to curtail their subordinates' freedom of expression.[37]

---

[37] There is a remarkable similarity between comments made in Congress in 1912, when the Lloyd-La Follette Act was passed, and in 1978, when the Civil Service Reform Act was enacted. In 1912, Representative Calder stated: "There are always two sides to every question, and surely if any man is competent to express an opinion regarding the needs of the postal service it is the men who perform the actual work. If anyone is competent to make known unsatisfactory working conditions, who, might I ask, is better qualified to lay his proper grievances before Congress than the men who have complaints to make and who suffer from these grievances?" 48 Cong. Rec. 4653 (1912). In 1978, a Senate Committee Print stated: "Federal employees are often the source of information about agency operations suppressed by their superiors. Since they are much closer to the actual working situation than top agency officials, they have testified before Con-

Thus, we do not decide whether or not it would be good policy to permit a federal employee to recover damages from a supervisor who has improperly disciplined him for exercising his First Amendment rights. As we did in *Standard Oil*, we decline "to create a new substantive legal liability without legislative aid and as at the common law," 332 U. S., at 302, because we are convinced that Congress is in a better position to decide whether or not the public interest would be served by creating it.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE MARSHALL, with whom JUSTICE BLACKMUN joins, concurring.

I join the Court's opinion because I agree that there are "special factors counselling· hesitation in the absence of affirmative action by Congress." *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 396 (1971). I write separately only to emphasize that in my view a different case would be presented if Congress had not created a comprehensive scheme that was specifically designed to provide full compensation to civil service employees who are discharged or disciplined in violation of their First Amendment rights, cf. *Carlson* v. *Green*, 446 U. S. 14, 23 (1980); *Sonntag* v. *Dooley*, 650 F. 2d 904, 907 (CA7 1981), and that affords a remedy that is substantially as effective as a damages action.

Although petitioner may be correct that the administrative procedure created by Congress, unlike a *Bivens* action,* does

gress, spoke to reporters, and informed the public. Mid-level employees provide much of the information Congress needs to evaluate programs, budgets, and overall agency performance." Senate Committee on Governmental Affairs, The Whistleblowers, 95th Cong., 2d Sess., 40 (Comm. Print 1978). See also H. R. Rep. No. 95–1403, pp. 386–387 (1978); S. Rep. No. 95–969, p. 8 (1978).

*See, *e. g.*, *Halperin* v. *Kissinger*, 196 U. S. App. D. C. 285, 300–301, 606 F. 2d 1192, 1207–1208 (1979), aff'd in pertinent part by an equally divided Court, 452 U. S. 713 (1981).

not permit recovery for loss due to emotional distress and mental anguish, Congress plainly intended to provide what it regarded as full compensatory relief when it enacted the Back Pay Act of 1966, 5 U. S. C. § 5596 (1982 ed.). The Act was designed to "pu[t] the employee in the same position he would have been in had the unjustified or erroneous personnel action not taken place." See S. Rep. No. 1062, 89th Cong., 2d Sess., 1 (1966). See H. R. Rep. No. 32, 89th Cong., 1st Sess., 5 (1965); cf. *Sampson* v. *Murray,* 415 U. S. 61, 82–83 (1974). Moreover, there is nothing in today's decision to foreclose a federal employee from pursuing a *Bivens* remedy where his injury is not attributable to personnel actions which may be remedied under the federal statutory scheme.

I cannot agree with petitioner's assertion that civil service remedies are substantially less effective than an individual damages remedy. See *ante,* at 372. To begin with, the procedure provided by the civil service scheme is in many respects preferable to the judicial procedure under a *Bivens* action. See Brief for Respondent 18–21. For example, the burden of proof in an action before the Civil Service Commission (now the Merit Systems Protection Board) must be borne by the agency, rather than by the discharged employee. See Civil Service Commission, Conducting Hearings on Employee Appeals 11 (1968); cf. *Finfer* v. *Caplin,* 344 F. 2d 38, 41 (CA2), cert. denied, 382 U. S. 883 (1965); *Pelicone* v. *Hodges,* 116 U. S. App. D. C. 32, 34, 320 F. 2d 754, 756 (1963). Moreover, the employee is not required to overcome the qualified immunity of executive officials as he might be required to in a suit for money damages. See *Butz* v. *Economou,* 438 U. S. 478 (1978). Finally, an administrative action is likely to prove speedier and less costly than a lawsuit. These advantages are not clearly outweighed by the obvious and significant disadvantages of the civil service procedure—that it denies the claimant the option of a jury trial, see *Carlson* v. *Green, supra,* at 22–23, and that it affords

only limited judicial review rather than a full trial in federal court, see *Chandler* v. *Roudebush*, 425 U. S. 840, 851–853 (1976).

As the Court emphasizes, "[t]he question is not what remedy the court should provide for a wrong that would otherwise go unredressed." *Ante*, at 388. The question is whether an alternative remedy should be provided when the wrong may already be redressed under "an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations." *Ibid.* I agree that a *Bivens* remedy is unnecessary in this case.