Justice Alito,
with whom Justice Ginsburg and Justice Kagan join, dissenting.
Petitioners are former federal employees who were discharged for failing to register for the military draft as *24 required under 5 U. S. C. § 3328. They filed a putative class-action suit in Federal District Court, arguing that the registration requirement is facially unconstitutional because it discriminates on the basis of gender and operates as a bill of attainder. Their complaint sought backpay as well as declaratory and injunctive relief reinstating their employment and preventing the Government from enforcing § 3328 against them.
The Court affirms the dismissal of petitioners’ suit on the ground that the Civil Service Reform Act of 1978 (CSRA) provides an exclusive administrative remedy for claims of wrongful termination brought by covered federal employees. Because the CSRA provides an avenue for employees to pursue their grievances through the Merit Systems Protection Board, the majority concludes, Congress must have intended to remove petitioners’ claims from the ordinary ambit of the federal courts.
The problem with the majority’s reasoning is that petitioners’ constitutional claims are a far cry from the type of claim that Congress intended to channel through the Board. The Board’s mission is to adjudicate fact-specific employment disputes within the existing statutory framework. By contrast, petitioners argue that one key provision of that framework is facially unconstitutional. Not only does the Board lack authority to adjudicate facial constitutional challenges, but such challenges are wholly collateral to the type of claims that the Board is authorized to hear.
The majority attempts to defend its holding by noting that, although the Board cannot consider petitioners’ claims, petitioners may appeal from the Board to the Federal Circuit, which does have authority to address facial constitutional claims. But that does not cure the oddity of requiring such claims to be filed initially before the Board, which can do nothing but pass them along unaddressed, leaving the Federal Circuit to act as a court of first review, but with little capacity for factfinding.
*25 Because I doubt that Congress intended to channel petitioners’ constitutional claims into an administrative tribunal that is powerless to decide them, I respectfully dissent.
HH
As a general matter, federal district courts have “original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.” 28 U. S. C. § 1331. Under this provision, it has long been “established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.” Bell v. Hood, 327 U. S. 678, 684 (1946). In light of § 1331, the question is not whether Congress has specifically conferred jurisdiction, but whether it has taken it away. See Whitman v. Department of Transportation, 547 U. S. 512, 514 (2006) (per curiam).
Congress may remove certain claims from the general jurisdiction of the federal courts in order to channel these claims into a system of statutory review. For example, in Shalala v. Illinois Council on Long Term Care, Inc., 529 U. S. 1 (2000), we considered a clause providing that “ ‘no action ... to recover on any claim’ ” arising under the Medicare laws “shall be ‘brought under section 1331 ... of title 28,’ ” id., at 5 (quoting 42 U. S. C. § 405(h); brackets omitted). When dealing with an express preclusion clause like this, we determine the scope of preclusion simply by interpreting the words Congress has chosen.
We have also recognized that preclusion can be implied. When Congress creates an administrative process to handle certain types of claims, it impliedly removes those claims from the ordinary jurisdiction of the federal courts. Under these circumstances, the test is whether “the ‘statutory scheme’ displays a ‘fairly discernible’ intent to limit jurisdiction, and the claims at issue ‘are of the type Congress intended to be reviewed within th[e] statutory structure.’” Free Enterprise Fund v. Public Company Accounting Over *26 sight Bd., 561 U. S. 477, 489 (2010) (quoting Thunder Basin Coal Co. v. Reich, 510 U. S. 200, 207, 212 (1994); alteration in Free Enterprise). In making this determination, we look to “the statute’s language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review” through the alternative administrative process that Congress has established. Thunder Basin, supra, at 207 (citation omitted).
We have emphasized two important factors for determining whether Congress intended an agency to have exclusive original jurisdiction over a claim. The first is whether the claim falls within the agency’s area of expertise, which would give the agency a comparative advantage over the courts in resolving the claim. “Generally, when Congress creates procedures ‘designed to permit agency expertise to be brought to bear on particular problems,’ those procedures ‘are to be exclusive.’ ” Free Enterprise Fund, supra, at 489 (quoting Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., 379 U. S. 411, 420 (1965)).
Second, even if a claim would not benefit from agency expertise, we nonetheless consider whether the claim is legally or factually related to the type of dispute the agency is authorized to hear. If so, the claim may be channeled through the administrative process to guard against claim splitting, which could involve redundant analysis of overlapping issues of law and fact. But for claims that fall outside the agency’s expertise and are “wholly collateral” to the type of dispute the agency is authorized to hear, the interest in requiring unified administrative review is considerably reduced. Thunder Basin, supra, at 212 (internal quotation marks omitted); see also Free Enterprise Fund, supra, at 490-491.
hH HH
The CSRA was enacted to “provide the people of the United States with a competent, honest, and productive Federal work force reflective of the Nation’s diversity, and to improve the quality of public service.” §3(1), 92 Stat. 1112. *27 To that end, the CSRA created an “integrated scheme of administrative and judicial review [of personnel actions], designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration.” United States v. Fausto, 484 U. S. 439, 445 (1988).
Chapter 75 of Title 5 sets forth detailed procedures for adverse actions taken against certain covered employees “for such cause as will promote the efficiency of the service.” 5 U. S. C. § 7513(a). When an agency takes such an action, it must provide the employee with advance written notice of the action and the specific reasons for it, give the employee an opportunity to respond, allow the employee to be represented by an attorney, and provide the employee with a final written decision. See §§ 7513(b)(1)-(4). Following these internal agency procedures, an aggrieved employee may appeal to the Merit Systems Protection Board. § 7513(d).
The Board’s mission is “to ensure that Federal employees are protected against abuses by agency management, that Executive branch agencies make employment decisions in accordance with the merit system principles, and that Federal merit systems are kept free of prohibited personnel practices.” Merit Systems Protection Board, An Introduction to the Merit Systems Protection Board 5 (1999). The Board adjudicates employment disputes in accordance with applicable federal laws and regulations, including the “[m]erit system principles” and “[prohibited personnel principles” identified in §§ 2301, 2302. After the Board renders a decision, the United States Court of Appeals for the Federal Circuit has exclusive jurisdiction on appeal. See §§ 7703(a)(1), (b)(1); 28 U. S. C. § 1295(a)(9).
The parties agree that petitioners are covered employees who may file an appeal to the Board protesting their removal from federal employment. The parties also agree, however, that the Board lacks authority to adjudicate claims like those asserted by petitioners, which attack the validity of a federal statute as a facial matter. As this Court has noted, “[a]dju- *28 dication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.” Thunder Basin, supra, at 215 (alteration in original; internal quotation marks omitted). The Board itself has consistently taken the position that it lacks “authority to determine the constitutionality of statutes.” Malone v. Department of Justice, 13 M. S. P. B. 81, 83 (1983) (citing Montana Ch. of Assn. of Civilian Technicians, Inc. v. Young, 514 F. 2d 1165, 1167 (CA9 1975)). Thus, the Board’s own self-described role in the administrative process is simply to apply the relevant statutes as -written, without addressing any facial challenges to the validity of those statutes.
r—( J—( t—(
There is no basis for the majority’s conclusion that petitioners must file their constitutional challenges before the Board instead of a federal district court. Congress has not expressly curtailed the jurisdiction of the federal courts to consider facial constitutional claims relating to federal employment, and no such limitation can be fairly discerned from the CSRA. Not only are petitioners’ claims “wholly collateral to [the CSRA’s] review provisions and outside the agency’s expertise,” Thunder Basin, supra, at 212 (internal quotation marks omitted), but the Board itself admits that it is completely powerless to consider the merits of petitioners’ arguments. In short, neither efficiency nor agency expertise can explain why Congress would want the Board to have exclusive jurisdiction over claims like these. To the contrary, imposing a scheme of exclusive administrative review in this context breeds inefficiency and creates a procedural framework that is needlessly vexing.
A
Petitioners argue that registration for the military draft violates the Equal Protection and Bill of Attainder Clauses. These facial constitutional arguments are entirely outside the Board’s power to decide, and they do not remotely impli *29 cate the Board’s administrative expertise. They have nothing to do with the statutory rules of federal employment, and nothing to do with any application of the “merit system principles” or the “prohibited personnel practices” that the Board administers.
Petitioners’ constitutional claims also have no relation to any of the facts that might be relevant to a proceeding before the Board. The Board typically addresses factual issues pertaining to the specific circumstances in which employee grievances arise. For example: Why was a particular employee removed from federal employment? Does the employer have a sound, nonprohibited basis for the employment action in question? See, e. g., Davis v. Department of Veterans Affairs, 106 MSPR 654, 657-658 (2007).
By contrast, petitioners’ claims involve general factual issues pertaining to the facial constitutionality of the military draft. The equal protection question is whether men and women are sufficiently different to justify disparate treatment under the Military Selective Service Act. Rostker v. Goldberg, 453 U. S. 57, 78 (1981). The factual record that petitioners wish to develop would address issues of gender difference that might be considered relevant to military service. See Brief for Petitioners 48 (alleging that “women’s role in the military has changed dramatically in the past thirty years”). Likewise, under the Bill of Attainder Clause, the key question is whether requiring draft registration as a condition of federal employment amounts to the singling out of a particular person or group for punishment without trial. See Nixon v. Administrator of General Services, 433 U. S. 425, 468-469 (1977). Whatever the relevant facts may be on either claim, it is clear that they can have no conceivable bearing on any matter the Board is authorized to address.
B
Administrative agencies typically do not adjudicate facial constitutional challenges to the laws that they administer. Such challenges not only lie outside the realm of special *30 agency expertise, but they are also wholly collateral to other types of claims that the agency is empowered to consider. When “the administrative appeals process does not address the kind of... constitutional claims” at issue, we cannot infer that Congress intended to “limi[t] judicial review of these claims to the procedures set forth in [the statutory scheme].” McNary v. Haitian Refugee Center, Inc., 498 U. S. 479, 493 (1991).
Several other cases confirm this basic principle. In Free Enterprise Fund, for example, the plaintiffs were not required to pursue their constitutional claims through the Public Accounting Company Oversight Board, because they were challenging the very existence of the Board itself. 561 U. S., at 490-491. Likewise, in Johnson v. Robison, 415 U. S. 361, 373-374 (1974), where petitioners brought claims “challenging the constitutionality of laws providing benefits,” the Court held that these claims were not precluded by a statute creating exclusive administrative review over how those benefits were administered. And in Mathews v. Eldridge, 424 U. S. 319, 327-332 (1976), we held that although a party challenging the denial of statutory benefits was generally required to proceed through the statutory process of administrative review, a constitutional challenge to the administrative process itself could still be brought directly in federal court.
The present case follows the same pattern: Petitioners are challenging the facial validity of a law that the Board is bound to apply to them, and so it makes little sense for them to seek review before the Board.
The wholly collateral nature of petitioners’ claims makes them readily distinguishable from claims that this Court has held to be impliedly excluded from the original jurisdiction of the federal courts. In Fausto, for example, we held that the CSRA precluded a statutory Back Pay Act claim involving a dispute over whether an employee had engaged in unauthorized use of a Government vehicle. 484 U. S., at 455. *31 The plaintiff in that case did not challenge the constitutional validity of the applicable legal framework, but argued instead that the framework had been improperly applied to him. He argued that he had been wrongfully suspended from work, and that he was entitled to backpay as a result. Id., at 440. For that type of fact-specific personnel dispute, we determined, Congress had intended for the CSRA’s comprehensive administrative scheme to provide the exclusive avenue of relief. Id., at 455.
Similarly, in Bush v. Lucas, 462 U. S. 367 (1983), we declined to allow a claim under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U. S. 388 (1971), brought by an employee seeking money damages for an alleged “retaliatory demotion or discharge because he ha[d] exercised his First Amendment rights.” 462 U. S., at 381. Although the claim was constitutional in nature, we noted that it “ar[o]se out of an employment relationship that is governed by comprehensive procedural and substantive provisions” that had been enacted by Congress. Id., at 368. The employee was pursuing an as-applied challenge that depended on the case-specific facts of why he had been fired. The gravamen of the employee’s claim was that he had been “unfairly disciplined for making critical comments about [his agency].” Id., at 386. Under the statutory scheme that Congress had created, the employee could have pursued a very similar statutory claim for wrongful removal within the administrative process. Id., at 386-388. Under these circumstances, we found that Congress did not intend to allow a duplicative nonstatutory claim for damages based on the same set of underlying facts.
Finally, the majority’s reliance on Thunder Basin is entirely misplaced. See ante, at 16-17. In that case, we found that a statutory scheme impliedly precluded a preenforcement challenge brought by a mining company seeking to enjoin an order issued by the Mine Safety and Health Administration. 510 U. S., at 205. Importantly, the plaintiff com *32 pany was seeking review of purely statutory claims that were reviewable in the first instance by the administrative commission that Congress had established. The only constitutional issue was a matter of timing: The company argued that it had a due process right to immediate judicial review of its statutory claims, because it would suffer irreparable harm if it were forced to wait until after the agency initiated an enforcement action. Ibid. The Court disagreed, holding that the statutory scheme was “consistent with due process” even though it provided for only postenforcement review. Id., at 218. Thus, the Court rejected the company’s constitutional claim “not on preclusion grounds but on the merits.” Id., at 219 (Scalia, J., concurring in part and concurring in judgment). The heart of the preclusion analysis was that the company could not use a preenforcement challenge to obtain judicial review of statutory claims that Congress had clearly intended to channel into administrative review.*
C
By requiring facial constitutional claims to be filed before the Board, the majority’s holding sets up an odd sequence of procedural hoops for petitioners to jump through. As the *33 Government concedes, the Board is powerless to adjudicate facial constitutional claims, and so these claims cannot be addressed on the merits until they reach the Federal Circuit on appeal. As a result, the Federal Circuit will be forced to address the claims in the first , instance, without the benefit of any relevant factfinding at the administrative level. This is a strange result, because “statutes that provide for only a single level of judicial review in the courts of appeals are traditionally viewed as warranted only in circumstances where district court factfinding would unnecessarily duplicate an adequate administrative record.” McNary, 498 U. S., at 497 (internal quotation marks omitted).
The Government admits that the absence of first-tier fact-finding might very well result in “the initial record” being “insufficient to permit meaningful consideration of a constitutional claim,” but suggests that the court could always “remand the case to the [Board] for further factual development.” Brief for Respondents 41. The majority accepts this solution, ante, at 19, but it is hard to see how it will work in practice. Without any authority to decide merits issues, the Board may find it difficult to adjudicate disputes about the relevancy of evidence sought in discovery. Nor will the Board find it easy to figure out which facts it must find before sending the case back to the Federal Circuit.
Even if these problems can be overcome, that will not resolve the needless complexity of the majority’s approach. According to the majority, petitioners should file their claims with the Board, which must then kick the claims up to the Federal Circuit, which must then remand the claims back to the Board, which must then develop the record and send the case back to the Federal Circuit, which can only then consider the constitutional issues.
To be sure, this might be sufficient to afford “meaningful review” of petitioners’ claims, ante, at 21, but that is not the only consideration. The question is whether it is “fairly discernible” that Congress intended to impose these pinball *34 procedural requirements instead of permitting petitioners’ claims to be decided in a regular lawsuit in federal district court. And why would it? As already noted, the benefits of preventing claim splitting are considerably reduced with respect to facial constitutional claims that are wholly collateral to an administrative proceeding. Because collateral constitutional claims have no overlap with the issues of law and fact that will pertain to the administrative proceeding, allowing the constitutional claims to be adjudicated separately before a district court does not invite wasteful or duplicative review. It simply allows the district court to develop the factual record and then provide a first-tier legal analysis, thereby enhancing both the quality and efficiency of appellate review.
To the extent that there is some need to prevent claim splitting, that purpose is already served by ordinary principles of claim preclusion. Plaintiffs generally must bring all claims arising out of a common set of facts in a single lawsuit, and federal district courts have discretion to enforce that requirement as necessary “to avoid duplicative litigation.” Colorado River Water Conservation Dist. v. United States, 424 U. S. 800, 817 (1976); Stone v. Department of Aviation, 453 F. 3d 1271, 1278 (CA10 2006) (“A plaintiff’s obligation to bring all related claims together in the same action arises under the common law rule of claim preclusion prohibiting the splitting of actions”). See also 18 C. Wright et al., Federal Practice and Procedure § 4406, p. 40 (2d ed. 2002, Supp. 2011) (discussing “principles of ‘claim splitting’ that are similar to claim preclusion, but that do not require a prior judgment”). Thus, if an aggrieved employee goes to a district court with claims that would duplicate the factfinding or legal analysis of a separate Board proceeding, the district court would be free to dismiss the case.
The majority suggests that its approach will allow the Board to resolve some cases on nonconstitutional grounds, *35 thus avoiding needless adjudication of constitutional issues. See ante, at 22-23. But achieving that goal does not require the blunt instrument of jurisdictional preclusion. District courts have broad discretion to manage their dockets, including the power to refrain from reviewing a constitutional claim pending adjudication of a nonconstitutional claim that might moot the case. See Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co., 342 U. S. 180, 183 (1952) (acknowledging the equitable discretion of courts, in furtherance of “[w]ise judicial administration” and “conservation of judicial resources,” to stay proceedings to prevent “two litigations where one will suffice” (internal quotation marks omitted)). In short, the district courts are well equipped to guard against piecemeal litigation without any help from the majority’s holding.
Finally, the majority contends that channeling facial constitutional claims through the Board is necessary to provide “clear guidance about the proper forum for the employee’s claims at the outset of the case.” Ante, at 15. Because it can be hard to tell the difference between facial and as-applied challenges, the majority argues, it is less confusing simply to require that all claims must be brought before the Board. This is a red herring. Labels aside, the most sensible rule would be to allow initial judicial review of constitutional claims that attack the validity of a statute based on its inherent characteristics, not as a result of how the statute has been applied. That line is bright enough, and the distinction is already one that the Board must draw based on its own determination that it can hear some as-applied challenges but lacks “authority to determine the constitutionality of statutes.” Malone, 13 M. S. P. B., at 83.
I—I <
The presumptive power of the federal courts to hear constitutional challenges is well established. In this case, however, the majority relies on a very weak set of inferences to *36 strip the courts of their original jurisdiction over petitioners’ claims. Because I believe Congress would have been very surprised to learn that it implied this result when it passed the CSRA, I respectfully dissent.

The majority contends that the petitioner in Thunder Basin really had two distinct constitutional claims. The primary constitutional claim was a “due process challenge to a statute that permitted a regulatory agency, before a hearing, to immediately fine the petitioner for noncompliance with the statute.” Ante, at 17, n. 6. On top of this, according to the majority, the petitioner also had a separate constitutional claim, which asserted that precluding initial judicial review of the first constitutional claim would violate due process. In the majority’s view, only the latter claim was rejected on the merits. But this hairsplitting makes no difference. The entire thrust of the petitioner’s constitutional argument was simply that proceeding through the statutory scheme would make meaningful judicial review impossible. The Court rejected that argument, effectively disposing of any constitutional infirmity that the petitioner alleged. Unlike in the present case, there was no freestanding constitutional claim attacking the validity of the statutory framework on substantive rather than procedural grounds.