**Mary–Anne LAFAYETTE**

v.

**Anthony FRANK, Postmaster General of the U.S. Postal Service and Michael Shinay, Postmaster, Burlington, Vermont, in their official capacities.**

**Civ. A. No. 88–87.**

United States District Court, D. Vermont.

June 3, 1988.

John D. Shullenberger, Mickenberg, Dunn, Sirotkin & Dorsch, Burlington, Vt., for plaintiff.

John M. Conroy, Asst. U.S. Atty., Burlington, Vt., Vanessa Miree, and Catherine V. Pagano, U.S. Postal Service, Washington, D.C., for defendants.

COFFRIN, Chief Judge.

Plaintiff's employer, the United States Postal Service, reassigned her in order to avoid the appearance of a conflict of interest. Plaintiff claims that the reassignment violates her first amendment right of association and her fifth amendment rights to due process and privacy. She seeks a preliminary injunction ordering her reinstatement in her previous position and ordering the Postal Service to provide her with an opportunity to confront and cross-examine witnesses at a hearing before it undertakes any further personnel action relating to the alleged apparent conflict of interest. For the reasons stated below, we deny plaintiff's motion for a preliminary injunction.

### Background/Findings of Fact

The parties have stipulated to the following facts:

1. The plaintiff, Mary–Anne Lafayette, is a citizen of the United States and a resident of the City of Burlington, Vermont.

2. At all times relevant to this action, defendant Shinay has been acting as an employee of the United States Postal Service.

3. Until April 9, 1988, plaintiff was employed as a full-time, non-probationary Logistics Coordinator at the Management Sectional Center (MSC) of the United States Postal Service in Burlington, Vermont. Plaintiff was compensated at a EAS–15 Step 6 grade level at an annual salary of $33,023.00.

4. Part of plaintiff's responsibilities as the Logistics Coordinator included

providing guidance to and coordinating activities between contract carriers and supervisors of the Postal Service to ensure the efficient movement of the mail and mail equipment.

5. On September 27, 1987, plaintiff informed defendant Shinay that she had a personal relationship with Mr. Jerry Nelson, a highway contractor with routes emanating from the Burlington Management Sectional Center. See Joint Exhibit 3.

6. Pursuant to defendant Shinay's instructions, the plaintiff ceased dealing with any matters in her job which could involve Mr. Nelson and those matters were to be instead handled by Mr. Shawn O'Brien, MSC, Director of Mail Processing, plaintiff's supervisor.

7. In a memorandum dated November 16, 1987, defendant Shinay advised James French, Regional Counsel for the Northeast Region of the possible conflict of interest and requested advice as to whether or not plaintiff could continue in her position as Logistics Coordinator. In that memorandum, defendant Shinay said that several days earlier, plaintiff had told him that she had started living with contractor Nelson. See Joint Exhibit 4.

8. Mr. French determined that in light of plaintiff's relationship with Mr. Nelson, plaintiff's duties and close relationship with the employees who administer contracts could create or appear to create a conflict of interest and so advised defendant Shinay in a memorandum dated November 18, 1987.

9. Plaintiff was advised of Mr. French's ruling regarding the conflict of interest issue and was informed that she could appeal the decision within 30 days to the Postal Service's Ethical Conduct Officer in Washington, D.C.

10. On December 18, 1987, plaintiff filed a written appeal with the Ethical Conduct Officer in Washington D.C. The appeal was handled by Mr. Charles Hawley, Assistant Ethical Conduct Officer for the Postal Service. In a letter dated January 8, 1988, plaintiff advised Mr. Hawley that the previous living arrangements between herself and Mr. Nelson were terminated. Plaintiff also requested a hearing to present further information, if the decision was to be unfavorable. See Joint Exhibit 7.

11. On January 25, 1988, Mr. Hawley issued an opinion in which he advised plaintiff that she could continue to work as the Logistics Coordinator provided that she remove herself from any situation which involved Mr. Nelson as the highway contractor. Plaintiff was further advised that she was not entitled to an administrative hearing regarding the conflict of interest issue. However, the Postal Service would consider any additional information as well as any comments which she had regarding its conclusion prior to the issuance of a final decision. See Joint Exhibit 11.

12. On February 8, 1988, plaintiff requested that the Postal Service reconsider its ruling. See Joint Exhibit 12.

13. On February 19, 1988, William, Ayers, Manager of the Transportation Management Center, Springfield, MA sent a memorandum to Mr. Hawley regarding the plaintiff. In the memorandum, Mr. Ayers stated that Mr. Nelson had seven (7) contracts in the Burlington, Vermont area which were under the plaintiff's supervision and that other contractors had complained that Mr. Nelson was receiving preferential treatment. The Memorandum of February 19, 1988 written by William Ayers was first provided to the plaintiff when a copy was enclosed with the letter to her of March 25, 1988 from Charles B. Hawley. See Joint Exhibit 14.

14. On March 25, 1988, Mr. Hawley issued a final ruling concerning the conflict of interest issue. In the decision, Mr. Hawley concluded that as long as plaintiff was the Logistics Coordinator and had responsibilities which may affect, or appear to affect, directly or indirectly the interest of Mr. Nelson, plaintiff's holding of that position would be compromised. The matter was remanded to plaintiff's supervisors for resolution. Mr. Hawley's letter of March 25,

1988 to the plaintiff was the final decision of the United States Postal Service with respect to the plaintiff's conflict of interest. See Joint Exhibit 15.

15. William Ayers did not personally receive any direct complaints from contractors that Mr. Nelson was receiving preferential treatment, but relied upon oral statements from other persons. Ayers states that other postal officials contacted him to say that contractors had complained of favoritism from plaintiff towards Mr. Nelson.

16. Neither Charles Hawley nor James H. French, Regional Council [sic], conducted an investigation into the facts of any alleged complaints concerning Mr. Nelson or the plaintiff.

17. Effective April 8, 1988, plaintiff was reassigned to the position of Supervisor, Mails, EAS-15. Her salary, benefits and work schedule were unaffected by the reassignment. The plaintiff's personal association with Mr. Nelson was the motivating factor in the decision by defendants to reassign plaintiff from her duties as Logistics Coordinator.

Stipulation of Facts (April 28, 1988).

On April 8, 1988, plaintiff filed this action challenging her reassignment from the position of Logistics Coordinator to Supervisor of the Mails. Plaintiff contends that her reassignment because of her personal relationship with Nelson violates her first amendment right of association and her fifth amendment right to privacy, and that the procedures defendant followed in reassigning her violated her fifth amendment right to due process. She seeks a variety of declaratory and injunctive relief.

At an April 8, 1988, hearing, this court denied plaintiff's motion for a temporary restraining order precluding her reassignment.

On April 28, 1988, the court held a hearing on plaintiff's motion for a preliminary injunction. Plaintiff seeks an interim order requiring defendant to reinstate her as Logistics Coordinator and, if any further personnel action is to be taken on account of her relationship with Nelson, requiring defendants to afford her a hearing where she can confront and cross-examine witnesses.

The parties submitted joint exhibits and stipulated to the facts detailed above. In addition, Shawn O'Brien and plaintiff presented testimony relevant to the issues of irreparable harm and the balance of hardships. On the basis of that testimony, the court finds as follows:

1. Plaintiff served as Logistics Coordinator at the Burlington MSC for three years. She was in all respects an outstanding employee, a fact reflected in a series of glowing performance evaluations.

2. O'Brien had agreed to the arrangement under which plaintiff remained in the position of Logistics Coordinator while O'Brien, as plaintiff's supervisor, handled all Logistics Coordinator duties relating to Nelson. O'Brien had no problem with this arrangement, and it did not impede his efficiency or effectiveness in his job or the efficiency of the mail processing operation at the Burlington MSC.

3. The Supervisor of Mails position to which plaintiff was reassigned is not a career dead end. Rather, the position has significant potential for career advancement within the Postal Service.

4. Plaintiff's reassignment did not involve any loss of pay or benefits or change in schedule.

5. At a March 11, 1988, meeting attended by plaintiff, Nelson, and Shinay, Shinay told plaintiff that she would have to choose between her relationship with Nelson and her job as Logistics Coordinator.

6. Plaintiff has never been provided with any details of the alleged complaints of favoritism towards Nelson referred to in Ayer's February 19, 1988, memorandum.

7. As a consequence of the Postal Service's conflict of interest determination, plaintiff and Nelson have by mutual agreement scaled back their relationship. They now communicate only by infrequent telephone calls.

8. As of the date of the preliminary injunction hearing, plaintiff had not reported to work as Supervisor of Mails. She had taken a week of annual leave and then

had been restricted from all work under her doctor's orders.

The Postal Service has assured the court that the Logistics Coordinator position will not be permanently filled until this litigation is resolved.

## Discussion

### 1. *Subject matter jurisdiction.*

■ The government contends that Congress, by enacting a comprehensive scheme for administrative and judicial review of personnel actions involving Postal Service employees, has divested the federal district courts of jurisdiction to hear challenges to such personnel actions. In support of this position, the government relies on *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) and *United States v. Fausto,* —— U.S. ——, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). Plaintiff, of course, argues that we do have subject matter jurisdiction. She contends that *Bush* and *Fausto* are inapplicable because in this case Congress has not provided a constitutionally adequate alternative process to address her first and fifth amendment claims. We agree with plaintiff.

*Fausto* involved interpretation of the Civil Service Reform Act of 1978 ("CSRA"), Pub.L. 95–454, 92 Stat. 1111 (codified as amended in various sections of 5 U.S.C.). Plaintiff is a member of the postal career service, 39 U.S.C. § 1001(b), which is an "excepted" service for CSRA purposes. *See* 5 U.S.C. § 2103; *Raicovich v. United States Postal Service,* 675 F.2d 417, 420 (D.C.Cir.1982). She is apparently not veterans preference eligible. *See* 5 U.S.C. § 2108. In the three CSRA chapters governing personnel action taken against members of the civil service, "Congress deal[t] explicitly with the situation of nonpreference members of the excepted service, granting them limited, and in some cases conditional, rights." *Fausto,* 108 S.Ct. at 672. *See generally* 5 U.S.C. chs. 23, 43 & 75. The *Fausto* Court concluded that

> [t]he comprehensive nature of the CSRA, the attention that it gives throughout to the rights of nonpreference excepted service employees, and the fact that it does not include them in provisions for admin-

istrative and judicial review contained in Chapter 75, combine to establish a congressional judgment that those employees should not be able to demand judicial review for the type of personnel action covered by that chapter.

*Id.* at 673. Thus, the Court held that Congressional enactment of the CSRA overcame the presumption of judicial review of agency action and impliedly repealed traditional Claims Court review of a nonpreference excepted service employee's statutory backpay claim based on an adverse personnel action.

Similarly, in *Bush v. Lucas,* the Court declined to imply a damage remedy for an alleged first amendment violation arising out of a federal employment personnel decision. The Court so held because it concluded that the elaborate system of civil service remedies in place prior to enactment of CSRA constituted a special factor counselling hesitation in the creation of a *Bivens* remedy. *See* 462 U.S. at 388–90, 103 S.Ct. at 2416–18; *cf. Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 396, 91 S.Ct. 1999, 2004–05, 29 L.Ed.2d 619 (1971). The Court's decision rested in part on its conclusion that the employee's first amendment claim was fully cognizable within the statutory scheme and that the scheme provided the employee with meaningful remedies, including the right to a full evidentiary hearing at the administrative appeal level and judicial review. *See id.* 462 U.S. at 386–88, 103 S.Ct. at 2415–17.

CSRA does not apply directly to postal service employees. *See* 5 U.S.C. § 2105(e). Nevertheless, the Postal Reorganization Act accords supervisory and management employees such as plaintiff the protections of subchapter II of chapter 75, *see* 39 U.S.C. § 1005(a)(4)(A)(ii), even though the CSRA itself does not extend those protections to nonpreference exempt service employees. *See* 5 U.S.C. § 7511(a)(1). Thus, if subjected to a removal, a suspension for more than 14 days, a reduction in grade or pay, or a furlough of 30 days or less, plaintiff would be entitled to Merit Systems Protection Board (MSPB) review and, even-

tually, judicial review by the Federal Circuit. *See* 5 U.S.C. §§ 7512, 7513(d) & 7703. For the type of personnel action involved in this case, on the other hand, plaintiff is only entitled to the limited safeguards provided for by the Postal Service's Code of Ethical Conduct, which plaintiff concedes were complied with. *See* 39 C.F.R. §§ 447.-31 & 447.32.

The government contends that *Fausto* and *Bush* require us to find that Congress, by providing Postal Service employees with a statutory right of review for certain adverse actions, intended to preclude all judicial review of Postal Service personnel actions that do not fall within chapter 75's definition of adverse actions, even if those personnel actions allegedly violate important constitutional rights. We disagree for four reasons.

First, plaintiff's administrative remedies are far less comprehensive than the statutory remedies available to the federal employee in *Bush*. We conclude that the remedies provided by the Postal Service's Code of Ethical Conduct are not "constitutionally adequate" to protect plaintiff's first and fifth amendment claims. *Bush*, 462 U.S. at 378 n. 14, 103 S.Ct. at 2412 n. 14. In so holding, we rely on decisions of the Ninth and Eighth Circuits and the District of New Hampshire holding that courts may imply a *Bivens* remedy for a federal employee's employment-based constitutional claims when the CSRA does not provide meaningful remedies. *See Kotarski v. Cooper*, 799 F.2d 1342, 1348–50 (9th Cir. 1986), *petition for cert. filed*, 55 U.S.L.W. 3794 (May 13, 1987); *McIntosh v. Weinberger*, 810 F.2d 1411, 1435–36 (8th Cir. 1987), *petition for cert. filed*, 56 U.S.L.W. 3184 (Sept. 2, 1987); *Kassel v. United States Veterans Admin.*, 682 F.Supp. 646, 652–54 (D.N.H.1988). In each of these cases, the challenged personnel action was at most a chapter 23 "prohibited personnel practice," and the CSRA provided only for discretionary action by the MSPB's Office of Special Counsel (OSC). *See also Spagnola v. Mathis*, 809 F.2d 16, 19–30 (D.C.Cir. 1986), *vacated in relevant part pending rehearing en banc*, 809 F.2d 16, 40–41 (D.C.Cir.1987); *Egger v. Phillips*, 710 F.2d

292, 297–300 (7th Cir.) (*en banc*, plurality opinion), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). Plaintiff in this case is not even entitled to this limited OSC remedy. *See* 5 C.F.R. § 1250.2(a)(4). By relying on these cases, we necessarily reject the Fourth Circuit's contrary decision in *Pinar v. Dole*, 747 F.2d 899, 904–09 (4th Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985). *See also Hubbard v. United States E.P.A. Admin.*, 809 F.2d 1, 6–11 (D.C.Cir.1986), *vacated in relevant part pending rehearing en banc*, 809 F.2d 1, 15 (D.C.Cir.1987); *Braun v. United States*, 707 F.2d 922, 925–26 (6th Cir.1983) (precedes Supreme Court decision in *Bush;* does not discuss constitutional adequacy of OSC remedy); *Broadway v. Block*, 694 F.2d 979, 985–86 (5th Cir.1982) (precedes Supreme Court decision in *Bush;* does not discuss constitutional adequacy of OSC remedy and only discusses in terms of procedural due process claims).

Second, *Bush* is inapplicable because plaintiff here seeks only equitable relief, rather than damages under an implied *Bivens* action. The District of Columbia Circuit has repeatedly drawn this distinction, and "has expressly held that *Bush* does not affect the traditional and well-settled authority of federal courts to *enjoin* unconstitutional government actions" relating to federal government employment. *National Fed'n of Fed. Employees v. Weinberger*, 818 F.2d 935, 940 (D.C.Cir.1987); *see Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1109 n. 17 (D.C.Cir.1985). Again, the Fourth Circuit in *Pinar* has taken the opposite approach, holding that, in enacting the CSRA, Congress intended to preclude all other avenues of judicial review of federal employment actions, and that the discretionary OSC remedy is constitutionally adequate for alleged first amendment violations otherwise unreviewable under the CSRA. *See* 747 F.2d at 909–12. We, however, agree with the District of Columbia Circuit's approach, and would require an explicit expression of Congressional intent to limit our inherent power to enjoin unconstitutional personnel actions by federal

agencies. *See Hubbard v. United States E.P.A. Admin.*, 809 F.2d 1, 11 n. 15 (D.C. Cir.1986), *vacated in part on other grounds pending rehearing en banc*, 809 F.2d 1, 15 (D.C.Cir.1987); *see also United States v. Fausto*, —— U.S. ——, 108 S.Ct. 668, 677, 98 L.Ed.2d 830 (1988) (Blackmun, J., concurring) ("the courts' common-law power to vindicate constitutional rights ... is not lightly to be set aside").

Third, we do not think the Court intended *Fausto* to extend to important constitutional claims. This conclusion follows from the immediately preceding discussion. It also follows from the *Fausto* Court's cautious emphasis on the narrowness of its holding: that the CSRA impliedly repealed a judicial implication from another statute, the Back Pay Act. 108 S.Ct. at 676.

Fourth, we are not convinced that the statutes governing review of Postal Service employment actions reflect the same "considered congressional judgment" the Court perceived in the CSRA. The *Fausto* Court found congressional intent to preclude review to be "fairly discernible" from the CSRA's statutory scheme. *Id.* Since *Fausto* was decided, the Court has required clear and convincing evidence of contrary legislative intent to overcome the strong presumption in favor of judicial review of administrative action. *Traynor v. Turnage*, —— U.S. ——, 108 S.Ct. 1372, 1378, 99 L.Ed.2d 618 (1988). We fail to discern the necessary Congressional intent in the remedial statutes applicable to plaintiff.

The government in this case would have us bootstrap findings of congressional intent that the Supreme Court based on the structure and history of the CSRA to the review provisions of the Postal Reorganization Act. In crafting the review provisions for postal service employees, however, Congress appears to have borrowed from the CSRA somewhat indiscriminately, and it has disregarded entirely the structure of the CSRA that the *Fausto* Court found was such compelling evidence of Congress's intent. As noted earlier, 39 U.S.C. § 1005 incorporates by reference only one of the three CSRA remedial chapters con-

sidered in *Fausto*, and excepted service employees in the postal service are entitled to chapter 75 remedies denied excepted service employees under the CSRA. Thus, we could only determine Congress's intent in this case by undertaking a comprehensive review of the statutes applicable to postal service employees, including the legislative history of the Postal Reorganization Act. The parties have not briefed this issue, and we decline to undertake the task without guidance. Consequently, we will apply the usual presumption that Congress intended judicial review, and we will proceed to the issue of the appropriateness of preliminary injunctive relief.

### 2. *Preliminary Injunction.*

■ To obtain a preliminary injunction, plaintiff must show

> (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). *See also American Postal Workers Union v. United States Postal Service*, 766 F.2d 715, 721 (2d Cir.1985), *cert. denied*, 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986). We conclude that plaintiff has failed to establish irreparable harm. Accordingly, we must deny plaintiff's motion.

Plaintiff claims that she will suffer irreparable harm (1) from the stigma of having been transferred on account of an ethical violation, which she alleges will tarnish both her professional and personal reputation, and (2) from interference with her constitutionally protected freedom to associate with Nelson. Plaintiff apparently does not rely on her alleged emotional injury, including loss of weight and headaches, in support of preliminary relief.

A federal employee seeking preliminary injunctive relief against a personnel action must make a particularly strong showing of irreparable harm, for courts may grant such interim relief only in "extraordinary"

cases. *See Sampson v. Murray*, 415 U.S. 61, 92 n. 68, 94 S.Ct. 937, 953 n. 68, 39 L.Ed.2d 166 (1974); *American Postal Workers Union*, 766 F.2d at 721. Under this standard, injury to reputation does not rise to the level of irreparable harm. *Sampson*, 415 U.S. at 91–91, 94 S.Ct. at 953–54; *Stewart v. United States Immigration & Naturalization Serv.*, 762 F.2d 193, 199–200 (2d Cir.1985). Plaintiff seeks to avoid *Sampson* by invoking the proposition that the loss of first amendment freedoms necessarily constitutes irreparable injury. *See Elron v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir.1978); *see also American Postal Workers Union*, 766 F.2d at 721 (Postal Service concedes that chilling of first amendment rights would constitute irreparable injury).

The *American Postal Workers Union* court conceived of the first amendment irreparable harm inquiry as being "twofold": whether plaintiff's first amendment rights were implicated at all, and if so, whether the personnel action at issue sufficiently chilled the exercise of those rights to justify preliminary injunctive relief. 766 F.2d at 721. The government in this case emphasizes the second requirement, contending that plaintiff has failed to "articulate a 'specific present objective harm or a threat of specific future harm' to establish a cognizable claim based on the chilling of first amendment rights." *Id.* at 722 (quoting *Laird v. Tatum*, 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972)). We need not reach this issue, as we find that plaintiff's first amendment rights were not implicated at all.

Plaintiff relies on the Eleventh Circuit's opinion in *Wilson v. Taylor*, 733 F.2d 1539, 1543 (11th Cir.1984), for the proposition that the first amendment freedom of association protects social dating. The Supreme Court's opinion in *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct.

3244, 82 L.Ed.2d 462 (1984), however, decided less than a month after *Wilson*, leads us to conclude that plaintiff has at best alleged a violation of substantive due process.

The *Roberts* Court observed that

Our decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

*Id.* at 617–18, 104 S.Ct. at 3249. Thus, social dating, if constitutionally protected at all, derives that protection from the due process clause and not from the first amendment. *See IDK, Inc. v. Clark County*, 836 F.2d 1185, 1191–92 (9th Cir.1988); *Trujillo v. Board of County Comm'rs*, 768 F.2d 1186, 1188 & n. 4 (10th Cir.1985). *But see Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir.1988) (assuming, without directly addressing issue, that freedom of intimate association discussed in *Roberts* is protected by first amendment).[1]

As plaintiff does not have a viable first amendment claim, she cannot rely on the first amendment exception to the usual irreparable harm requirement. Moreover, plaintiff has not even attempted to show

---

1. The Second Circuit has held that the first amendment, as well as the right to privacy, protects a public housing project tenant's right to have overnight guests. *McKenna v. Peekskill Hous. Auth.*, 647 F.2d 332, 335 (2d Cir.1981).

*McKenna* was, however, decided before *Roberts*, and if faced with the same issue today, we do not think the Second Circuit would decide it under the first amendment.

how interference with her fifth amendment right of privacy constitutes irreparable harm. We have already determined that loss of reputation alone does not constitute irreparable harm under *Sampson.* Consequently, we conclude that plaintiff has failed to establish the first prong of the preliminary injunction test. A clear showing of irreparable harm is a prerequisite to preliminary injunctive relief. *Triebwasser & Katz v. American Tel. & Tel. Co.,* 535 F.2d 1356, 1359 (2d Cir.1976). Accordingly, we must deny plaintiff's motion.

#### Summary and Order

Plaintiff's motion for a preliminary injunction is DENIED.