William W. RISHER, Plaintiff,

v.

Gary HIBNER, Guiseppi Guerini, Robert Paliwoda, Edward Michaeli, and Gregory Jach, Defendants.

No. 93–CV–72750–DT.

United States District Court, E.D. Michigan, Southern Division.

July 7, 1994.

Joseph A. Goldern, Southfield, MI, for plaintiff.

Jennifer M. Gorland, Detroit, MI, for defendants.

*OPINION AND ORDER GRANTING DEFENDANTS' RENEWED MOTION TO DISMISS AND FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

## I. *INTRODUCTION*

This is a three-count action for interference with contractual relationship, interference with business expectancy, and intentional infliction of emotional distress brought by William Risher, a former civilian employee of the U.S. Army. At the time of the events upon which Plaintiff's Complaint is predicated, Mr. Risher was employed as an instructor on track vehicles at Army's Tank Automotive Command in Warren, Michigan ("TACOM"). The defendants are five current and former (retired) civilian TACOM supervisors.[1]

## II. *PROCEDURAL HISTORY*

Plaintiff filed his Complaint in Macomb County Circuit Court in May 1993. Plaintiff alleges in his Complaint that during the course of his employment with TACOM, he

---

1. Defendant Guiseppi Guerini passed away in October 1993, after the filing of this lawsuit. Plaintiff has not sought to substitute Mr. Guerini's estate as a party to this action.

was subjected to "various and repeated improper, unethical, and/or fraudulent actions" by the Defendants which culminated in his "constructive discharge" when the Army placed him on unpaid medical leave on August 13, 1992.

Defendants timely removed the action to this Court on June 30, 1993, relying upon 28 U.S.C. § 2679(d)(2) as the basis of removal.[2] Then, as their initial responsive pleading, on August 16, 1993, Defendants filed a Motion to Dismiss and for Summary Judgment. Plaintiff responded to that initial Motion on August 25, 1993, to which response Defendants subsequently replied.

On November 1, 1993, the Court concluded that, in the interest of justice, discovery should be completed before a decision was rendered on Defendants' dispositive Motion. Therefore, the Court entered an Order denying the August 16, 1993 Motion as premature, without prejudice to Defendants' right to re-file the motion after the close of discovery. Acting in accordance with the November 1, 1993 Order, on February 28, 1994, Defendants filed their "Renewed Motion to Dismiss and for Summary Judgment". Plaintiff did not file any response to this February Renewed Motion until 5 and 1/2 months later, on May 12, 1994, i.e., after the Court notified counsel that the Motion would be heard on May 19, 1994. Plaintiff's May 12 Response repeats the arguments he made in his response to the Defendants' initial motion.[3] On May 13, 1994, Defendants' replied to Plaintiff's Response.

The Court twice scheduled Defendants' Motion for oral argument but each time, the parties have requested that the hearing be adjourned. Having reviewed and considered the parties' respective Briefs and supporting documents, the Court has determined that oral argument is unnecessary, and therefore, pursuant to Local Rule 7.1(e)(2) this matter will be decided "on the briefs". This Opinion and Order sets forth the Court's decision.

## II. FACTUAL BACKGROUND

Plaintiff William Risher began his employment as a New Equipment Training Instructor at TACOM in June 1981. During the course of his 11–year tenure at TACOM, Risher was, at various times, under the supervision of Defendants Robert Paliwoda, Edward Michaeli, Guiseppi Guerini, Gary Hibner and Gregory Jach. Mr. Risher complains in this action about various actions taken by the named supervisors with respect to his employment since 1986. Mr. Risher testified in his deposition that he had no dealings outside of work with Defendants Michaeli, Hibner or Jach. However, Defendants Paliwoda and Guerini were social friends of his.

Plaintiff alleges in his Complaint the following wrongful acts of the Defendants as the basis for his claims: ·

a. Falsification, alteration, and/or inaccurate reflections on Plaintiff's performance evaluations and/or reviews;

b. Placement of false and/or inaccurate documents into Plaintiff's personnel file;

c. Threats of dismissal based on personal animus;

d. Denial of recognition for services rendered to the United States;

---

**2.** 28 U.S.C. § 2679(d)(2) provides:

Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place in which the action or proceeding is pending. Such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. This certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal.

**3.** In their Renewed Motion and Brief, Defendants combined the arguments they raised in their August 16, 1993 Motion and Brief, and the additional arguments they raised in their August 31, 1993 Reply Brief. Defendants have now also added one new argument. Plaintiff re-asserts in his May 12, 1994 Response the arguments he made in his August 25, 1993 Response. He also addresses in the new Response the one new argument made by Defendants in their February 28, 1994 Motion and Brief.

e. Denial, reduction, and/or refusal to properly grant recommended awards, medals, and accommodations;

f. Disregard for health-related travel restrictions;

g. False charges of AWOL (Absent Without Leave);

h. False reprimands;

i. Verbal abuse and ethnic slurs not related to employment;

j. Harassment and/or interference with job duties, responsibilities and performance based on personal animus.

[Complaint, para. 17.]

These very same allegations were the basis of a Claim for Compensation filed by Mr. Risher on December 18, 1992 under the Federal Employees' Compensation Act ("FECA"). In that FECA claim, Mr. Risher stated that he was suffering from an emotional condition ["depression, stress, [and] anxiety"], and that he first realized that this condition was caused by his employment on August 14, 1992, i.e., the day after he was placed on unpaid medical leave. [See Defendants' Ex.A.] In support of his FECA claim, Plaintiff submitted a seven-page single-spaced chronological description of the employment factors which he believed caused his complained of medical condition. [See Defendants' Ex. B.]

The sworn testimony given by Plaintiff in his deposition in this lawsuit demonstrates that the facts upon which his tortious interference and intentional infliction of emotional distress claims in this action are based are the very same facts upon which his FECA claim was predicated.

Plaintiff testified that the following specific actions of the Defendants are the basis of the claims of wrongful conduct enumerated in Paragraph 17 of his Complaint.

---

**4.** Plaintiff was a GS–11 employee.

**5.** "SKAP" is the acronym for the "Skill, Knowledge, Aptitude and Performance" evaluation process used to evaluate an employee for an upgrading in position.

(1) *Falsification, alteration, and/or inaccurate reflections on Plaintiff's performance evaluations and/or reviews*

Plaintiff contends that in the years preceding 1985, he consistently received high "exceeded standards" evaluations, and in 1985, he was given a "quality step" increase in salary. When, in April 1985, a GS–12 position[4] was posted, Plaintiff applied for it. Applicants for that GS–12 position were subject to evaluation under the "SKAP" process.[5] Under the SKAP process, job applicants are given a letter rating of "A, B, C or D" by a panel or board of evaluators, "A" being the highest of the ratings. Plaintiff Risher's "SKAP" rating for the April 1985 position was "C". In fact, all of the GS–11 instructors who applied for the new GS–12 position were given "C" ratings. The panel doing the SKAP evaluations consisted of Defendants Gary Hibner and Edward Michaeli.

Plaintiff was not satisfied with his SKAP rating and he, therefore, took it upon himself to challenge the SKAP process. Plaintiff contends that he succeeded with his challenge, and as a result, the April 1985 SKAPs were retracted, and a new SKAP process was put into operation.

Mr. Risher contends that since his challenge of the SKAP system, in each of his performance evaluations since 1986—which were done by Defendants Hibner, Michaeli, Guerini and Paliwoda—he was downgraded in at least one element a year. Plaintiff disagreed with the negative aspects of his evaluations and felt that he did not deserve any downgrading. It is this disagreement with his supervisors' evaluations of his performance that forms the basis of Plaintiff's allegations in Paragraph 17(a) of his Complaint of "falsification, alteration, and/or inaccurate reflections on Plaintiff's performance evaluations".[6]

However, Mr. Risher only identified one specific downgraded evaluation—his 1991 evaluation done by Defendant Bob Paliwoda.

---

**6.** *See also,* paragraphs 1 and 2 of Mr. Risher's FECA claim "chronological description" of employment factors. [Defendants' Ex. B.]

Mr. Paliwoda allegedly downgraded Risher in "personal conduct." Risher claims that Paliwoda's reason for the downgrade in that category related to Risher having paid for spare parts for his training vehicle out of his pocket. Apparently, Risher then vigorously attempted (unsuccessfully) to have the money he spent on the parts reimbursed by Paliwoda. Risher believes that he was downgraded because "[he] told them how to recover my money."

He claims that he submitted a grievance to his union representative regarding the 1991 downgrade [7] but his union "let the 15-day time frame [for pursuing grievances] elapse, and the grievance never got filed in a timely manner."

### (2) *Placement of false and/or inaccurate documents into Plaintiff's personnel file*

In September 1986, Risher had a work-related back injury for which he filed a compensation claim. Risher's supervisor at the time of the injury was Defendant Guerini. In connection with Mr. Risher's compensation claim, Mr. Guerini was required to submit to the Department of Labor a report regarding the claimed injury. Risher claims that in Guerini's report, he stated that Risher was not injured on the worksite. Mr. Risher's claim was denied.

Risher claims he then wrote to the Department of Labor to find out why his compensation claim was rejected. He claims that in response to that letter, the Department of Labor sent him a copy of Mr. Guerini's letter which Mr. Risher contends "was totally fictitious, the whole letter was fiction."

According to Risher, once there is an on-site occupational injury, the supervisors have to have a meeting with subordinates and tell them how to avoid such accidents. Risher believes that Guerini "didn't want to have to do this safety training", and that is why Guerini lied in his Department of Labor statement. Risher claims that he highlighted various items in Guerini's letter and sent it

back to the Department of Labor and, subsequently, the claim rejection decision was reversed. Risher admits that he got compensated and reimbursed for his lost pay, and he returned to work. Risher believes, however, that because he challenged Guerini's report regarding his compensation claim, Defendant Gary Hibner, who was over Guerini in the supervisory chain-of-command, transferred Mr. Risher out of the Tracks instruction group to the Wheels group under the supervision of Defendant Bob Paliwoda. Mr. Risher believes he is best suited for Tracks.

With regard to other claims of "placement of false documents in Plaintiff's personnel file," Risher also points to a letter of reprimand put in his file by Defendant Paliwoda in 1988. Risher contends that he "challenged it [through the collective bargaining grievance process] and it was a total fabrication." Risher succeeded with his grievance, and the reprimand letter was ultimately removed from his file.

Risher was subsequently transferred back to the Tracks group and Mr. Guerini's supervision in October 1988. He remained under Guerini's supervision until late 1991.[8] Risher believes that this re-transfer to Guerini's group was the result of his having challenged Wheels supervisor Paliwoda on the reprimand letter.

With respect to "false" documents, Risher also refers to a letter written by Defendant Gregory Jach in June 1992 marking him "AWOL" because he did not obtain prior approval prior to taking an annual leave day, and did not provide medical documentation for a five-day absence from work for his absence to be deemed a "medical" leave. Risher disputed not having called in on the mornings of his absence, and he further disputed the necessity for medical documentation since he was taking annual leave time, not medical leave time.

---

7. Risher's was a member of the American Federation of Government Employees, Local 1658, and his employment was covered by a collective bargaining agreement.

8. Plaintiff testified that in 1991, Defendants Paliwoda and Gregory Jach became supervisors over all training instructors.

According to Mr. Risher, he successfully grieved Jach's 1992 AWOL letter and as a result, the AWOL was retracted.[9]

(3) *Threats of dismissal based on personal animus*

In paragraph 17(c) of Plaintiff's Complaint, Mr. Risher complains that some of the Defendants threatened him with dismissal out of personal animus.

He claims that he was told by a friend of his, Jerry Tucker, that, while having a drink at the Officers' of N.C.Os' Club, Tucker mentioned Risher to Defendant Ed Michaeli and Michaeli allegedly responded, "That son-of-a-bitch just got me a letter for five years in my personnel file for drinking on duty and I am going to fire that bastard no matter what it takes."

According to Mr. Risher, prior to Tucker's discussion with Michaeli, Risher had reported Michaeli to Colonel Mannis for drinking on duty. Risher claims that the drinking incident occurred shortly after he had had a grievance meeting with the Colonel regarding his 1988 reprimand letter,[10] and he believed that a reprimand for the drinking should have been included in the resolution of his grievance. He claims that that is why he reported the incident to Col. Mannis.[11]

In addition to what Jerry Tucker told Risher that Defendant Michaeli said at the Officers' Club, Risher also claims as evidence of threats of dismissal based on personal animus that Defendant Jach had told one of Risher's co-workers sometime in 1991 (prior to Jach's reprimand letter) that Ed Michaeli had told him to get Bill Risher's ass by whatever means.

As further evidence of threats of dismissal, Mr. Risher also points to the directive addressed to him and five other individuals informing them that they were all on call for Desert Storm duty, and if they refused to go if called they would be subject to dismissal.

(4) *Denial of recognition of services rendered to the U.S.*

Plaintiff claims that the four-man team he served with in Desert Storm were commended by the military commander, Colonel Smith, who recommended them for a civilian medal and a $2,500 cash award for Desert Storm work "beyond the call of duty". However, Ed Michaeli and Michaeli's military counterpart at TACOM turned down the award because they deemed the team to not have worked beyond the call of duty because they refused a request that they stay on in Saudi Arabia for an additional 90-days.[12]

Risher also claims as support for his allegation of denial of recognition of services that he frequently spent time as part of the SMART program ("Supply and Maintenance Assessment and Review Team") designing ways to improve government equipment. (The SMART program paid monetary awards for good ideas.) He was told by Defendant Jach (at some point in time) that he should not spend his time working on the improvements; that he was hired as an instructor and he should spend his time preparing for his teaching assignments.

Risher claims he continued to work on improvements on his computer at home and he continued to submit them. However, it appears that in 1992, the amount of the monetary awards for which Risher claims he was eligible, was significantly cut. Plaintiff appears to believe that Defendant Hibner was responsible for the cuts.[13] He admits that there was a revision in the SMART

9. This AWOL incident is also the basis of Plaintiff's "false charges of AWOL" allegation in Paragraph 17(g) of his Complaint.

10. Risher testified that he assumed Michaeli and the men he was drinking with were drinking to his demise because he knew of no other reason for the group to be celebrating.

11. Risher believes that Michaeli was also out to get him because he believes that Michaeli had mistakenly assumed that Risher had told Jerry Tucker that Michaeli had made some disparaging remarks about Tucker's wife, who is Asian.

12. Risher claims that he wanted to stay on for 90 days as requested but the rest of his team refused. Risher claims, however, that when he told his TACOM military commander that he had a broken jaw, the commander said, "Get your ass home."

13. According to Risher, the awards he was eligible for ranged from $100 to $750 until the change. Now, he is only eligible for $25 awards.

procedures and, based on his job description, he was no longer entitled to large monetary awards, but he claims that because he earned the award prior to the revision, Hibner could have paid him larger awards.

Risher also complains that when others were given SMART recognitions, they were recognized in group meetings. But when he was given SMART recognitions, they would merely be left on his desk.

#### (5) *Disregard for health-related travel restrictions*

Plaintiff's allegation of disregard for health-related travel restrictions is predicated in part upon the poor health of his mother in 1989–1990. Risher received orders to travel to Germany.[14] Mr. Risher's mother was ill during this time frame and Risher requested that he not be required to travel while she needed continuous medical care. Defendant Gary Hibner told Mr. Risher that he needed a letter from his mother's doctor declaring her condition and the need for Mr. Risher to care for her.

Risher brought in a letter from a doctor which stated: "To Whom it May Concern: Reference Rachel Risher. Mrs. Risher has gangrene in her left foot and I feel it is necessary for her to be under the care of her son William." Hibner told Risher this letter was insufficient; that he needed something more which explained his mother's problem. Risher complied with Hibner's request and presented a second letter, and he was ultimately relieved of travel requirements. Plaintiff's complaint about this matter is that he felt that Hibner's treatment of the matter was "incompassionate."

Risher also points to his own hospitalization in January of 1992 as evidence of disregard for health-related restrictions. Risher was hospitalized for "two or three or four days" for chest pain. He returned to work and did not bring any medical statement that his travel or work should be restricted. Plaintiff was placed on orders to travel to Korea. Even though he did not bring in any medical certification of health restrictions, he

believes that being placed on orders demonstrates the supervisors' disregard for his health-related restrictions because "the entire management staff knew of my condition and stay at St. Joe Hospital. They sent me a get-well card and so forth, and all signed it. They knew I was there."

When Plaintiff finally brought in a letter from his doctor on May 28, 1992, the matter was resolved and he was advised by Gary Hibner, "This is what we are looking for. You don't have to travel."

#### (6) *False charges of AWOL*

Tied into the problems Plaintiff related regarding his 1992 hospitalization are his claims of false charges of AWOL. Because Plaintiff was off work for more than three days and did not immediately bring in medical certification, he was marked "AWOL" for his days absent. This matter was ultimately corrected once he brought in the letter from his doctor on May 28, 1992.

#### (7) *Verbal abuse and ethnic slurs*

Plaintiff's complaint of verbal abuse and ethnic slurs relate to his claim that he was offended by terms such as "zipper head", "gook", and "chink" in reference to persons of Asian extraction. (Risher's wife is Asian.) He claims that Defendants Michaeli, Paliwoda and Jach frequently used those terms in relating stories about their own past experiences in the armed forces. Plaintiff stated in his deposition that "I feel very hurt when I have to listen to those types of phrases cast on people whether they be black, Asian, Indian or whatever." He does not claim that any remarks were ever directed at him or at his wife.

### IV. *LEGAL ANALYSIS*

#### A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the

---

**14.** Traveling to other military bases to instruct on military equipment was part of Plaintiff's job description.

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[15] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the · entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989).

The Court will apply the foregoing standards in deciding Defendants' Renewed Motion to Dismiss and for Summary Judgment in this case.

### B. PLAINTIFF'S CLAIMS ARE PREEMPTED UNDER THE CSRA

As discussed above, in this case, Plaintiff is alleging in this suit three state-law tort claims against the Defendants: interference with contractual relationship; interference with business expectancy; and intentional infliction of emotional distress. Defendants argue that all three of Plaintiff's claims are preempted under the Civil Service Reform Act of 1978, 5 U.S.C. § 1101, *et seq.* (the "CSRA").

It is well-settled that state law is preempted by federal law where it creates "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Thus, in determining whether a federal statute preempts state law, the starting point is to examine Congress's intent in enacting the statute. *California Savings and Loan Ass'n v. Guerra*, 479 U.S. 272, 280–81, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987).

The Supreme Court discussed in detail the Congressional intent underlying the CSRA and the comprehensiveness of the remedial

---

**15.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

system provided in the Act in *United States v. Fausto*, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988):

> [T]he CSRA comprehensively overhauled the civil service system, creating an elaborate new framework for evaluating adverse personnel actions against federal employees. It prescribes in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review....
>
> A leading purpose of the CSRA was to replace the haphazard arrangements for administrative and judicial review of personnel action, part of the "outdated patchwork of statutes and rules built up over almost a century" that was the civil service system. S.Rep. No. 95–969, p. 3 (1978), U.S.Code Cong. & Admin.News 1978, p. 2723....
>
> Criticism of this "system" of administrative and judicial review was widespread. The general perception was that the "appeals processes [were] so lengthy and complicated that managers [in the civil service] often avoid[ed] taking disciplinary action" against employees even when it was clearly warranted. S.Rep. No. 95–969, at 9, U.S.Code Cong. & Admin.News 1978, p. 2731. With respect to judicial review in particular, there was dissatisfaction with the "wide variations in the kinds of decisions ... issued on the same or similar matters," *id.*, at 63, U.S.Code Cong. & Admin.News 1978, p. 2785, which were the product of concurrent jurisdiction, under various bases of jurisdiction, of the district courts and the Court of Claims....
>
> Congress responded to this situation by enacting the CSRA, which replaced the patchwork system with an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration. See S.Rep. No. 95–9669, at 4.
>
> \* \* \* \* \* \*
>
> Chapter 23 of the CSRA establishes the principles of the merit system of employment, § 2301, and forbids an agency to engage in certain "prohibited personnel practices"....
>
> Chapter 75 of the Act governs adverse action taken against employees ... which includes action ... based on misconduct. Subchapter I governs minor adverse action (suspension for 14 days or less) ... and Subchapter II governs major adverse action.... In each subchapter, covered employees are given procedural protections ... and in Subchapter II [major adverse actions] covered employees are accorded administrative review by the MSPB [Merit System Protection Board], followed by judicial review in the Federal Circuit.

484 U.S. at 443–447, 108 S.Ct. at 671–673 (some citations omitted).

The comprehensiveness of the CSRA's remedial system was also the basis for the Court's decision in *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), a case which is often referred to as the "seminal" case of CSRA preemption.

*Bush* involved a *Bivens*-type action[16] brought by a NASA aerospace engineer against the director of the Marshall Space Center (where the plaintiff was employed). The plaintiff alleged that the defendant director defamed him and demoted him in retaliation for his exercise of his First Amendment rights. He sought to recover damages from the defendant for the constitutional violation. The Court held that the claims raised by the plaintiff were fully cognizable under the elaborate and comprehensive scheme created by the CSRA and thus, no judicial remedy for damages was available to him. The Court explained:

> Given the history of the development of civil service remedies and the comprehensive nature of the remedies currently available, it is clear that the question we confront today is quite different from the typical remedial issue confronted by a common-law court. The question is not what remedy the court should provide for a

---

**16.** *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue. That question obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff. The policy judgment should be informed by a thorough understanding of the existing regulatory structure and the respective costs and benefits that would result from the addition of another remedy for violations of employees' First Amendment rights.

The costs associated with the review of disciplinary decisions are already significant—not only in monetary terms, but also in the time and energy of managerial personnel who must defend their decisions. Respondent argues that supervisory personnel are already more hesitant than they should be in administering discipline, because the review that ensues inevitably makes the performance of their regular duties more difficult ... Whether or not this assessment is accurate, it is quite probable that if management personnel face the added risk of personal liability for decisions that they believe to be a correct response to improper criticism of the agency, they would be deterred from imposing discipline in future cases. In all events, Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service....

Thus, we do not decide whether or not it would be good policy to permit a federal employee to recover damages from a supervisor who has improperly disciplined him for exercising his First Amendment rights. As we did in [*United States v.] Standard Oil*, [332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947) ], we decline "to create a new substantive legal liability without legislative aid ...," because we are convinced that Congress is in a better position to decide whether or not the public interest would be served by creating it.

462 U.S. at 388–390, 103 S.Ct. at 2416–2417 (some citations omitted).

The comprehensive CSRA system discussed by the *Bush* and *Fausto* courts includes the establishment of a merit system of employment for federal employees. *See* 5 U.S.C. § 2301. The Act also regulates conduct of managerial/supervisory employees when they are engaged in specific "personnel actions." *See* 5 U.S.C. § 2302. "Personnel actions" covered by the CSRA include promotions and demotions; disciplinary or corrective actions; transfers and reassignments; performance evaluations; decisions concerning pay, benefits or awards; and changes in job duties or responsibilities. 5 U.S.C. § 2302(a)(2)(A). The Act further specifically prohibits "willful obstruction" of an employee's work performance. 5 U.S.C. § 2302(b).

Guided by *Bush* and *Fausto*, numerous courts have held that where state common law claims are included in the "personnel actions" employees can challenge under the CSRA, those state law actions are preempted.

For example, in *Broughton v. Courtney*, 861 F.2d 639 (11th Cir.1988), the plaintiff, a civilian employee of the Navy, was demoted for failing to obey an order. He filed an action in a Florida state court against his supervisors claiming that the defendants tortiously interfered with his employment and engaged in a conspiracy to interfere with his employment. After removing the action to federal court the defendant moved to dismiss arguing that the CSRA preempted the plaintiff's state law tortious interference suit. The district court denied the motion. The Eleventh Circuit reversed explaining:

The [underlying] actions plaintiff challenges include recommending certain applicants for employment positions, assigning work, disciplining employees, and restructuring the workforce. Under 5 U.S.C.A. § 2302(a)(2)(A), personnel actions covered by the CSRA include appointments, promotions, disciplinary actions, transfers or reassignments, performance evaluations, and significant changes in duties and responsibilities inconsistent with the employee's job. The actions chal-

lenged in this case thus are personnel actions within the meaning of the CSRA.

Plaintiff's claims of tortious interference with employment involve willful obstruction of his work performance and giving unauthorized preference to the employee who eventually replaced him. Plaintiff's conspiracy action includes claims of bad faith or malevolent intent on the part of [supervisors] Courtney and D'Lugos. Under 5 U.S.C.A. § 2302(b), it is a prohibited employment practice to deceive or willfully obstruct any person with respect to that person's right to compete for employment, to influence any person to withdraw from competition for the purpose of improving or injuring the prospects of any other person for employment, or to grant any preference not authorized by law, rule, or regulation to any employee or applicant for employment. 5 U.S.C.A. § 2302(b)(4), (5), and (6). Plaintiff's claims are thus included among 5 U.S.C.A. § 2302(b)'s prohibited employment practices. . . .

As indicated, the specific actions challenged in this case are defined as personnel actions in 5 U.S.C.A. § 2302(a). The prohibited personnel actions defined in 5 U.S.C.A. § 2302(b) include a variety of actions otherwise characterized as torts under state law. The fact that these are intentional torts does not mean that they are not included in 5 U.S.C.A. § 2302(b). As the Senate Report made clear, "A prohibited personnel practice is a personnel action which is taken for a prohibited purpose." S.Rep. No. 969, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.News 2742. Plaintiff's characterization of his claims as conspiracy and intentional interference with employment claims does not alter our conclusion that the claims are included within the scope of 5 U.S.C.A. § 2302(b).

Finally, defendants are among that class of federal employees whose personnel decisions may be challenged under the CSRA. Plaintiff conceded at oral argument that defendant Courtney acted as his supervisor. It was undisputed that defendant D'Lugos was plaintiff's supervisor. These actions were then taken by an "employee who has authority to take, direct others to take, recommend, or approve any personnel action." 5 U.S.C.A. § 2302(b).

. . . This action, then, clearly falls within the scope of the CSRA. In light of the congressional policy to unify challenges to federal personnel actions, we hold these state law claims are preempted under the CSRA.

861 F.2d at 643–644.

Similarly, in *Lehman v. Morrissey*, 779 F.2d 526 (9th Cir.1985), the Ninth Circuit held that the plaintiff's common law claim of intentional infliction of emotional distress was preempted under the CSRA because the complained actions of her supervisor underlying her claim were "failing to provide her with adequate information to adequate information with which to perform specific tasks", "refusing to give her exposure to key areas," "not including her on trips to special training sessions," and being "unavailable for the plaintiff's questions." 779 F.2d at 526. The court found that

Lehman's case is covered by the statute. The kinds of activities about which she complains are specifically prohibited by the C.S.R.A. *See* 5 U.S.C. §§ 2301(b)(7) (1982) (employees should receive effective training). 2302(b)(4) (1982) (supervisor may not willfully obstruct employee's right to compete for employment), 2302(b)(11) (1982) (supervisor may not take any action violating any of the merit systems principles of § 2301) and 7513 (1982) (dismissal only for cause).

\*    \*    \*    \*    \*    \*

Lehman failed to pursue her administrative remedies under the C.S.R.A. That statute provides Lehman's sole recourse. *Id.* at 527–528. *See also, David v. United States*, 820 F.2d 1038 (9th Cir.1987) (district court's grant of summary judgment in favor of plaintiff's supervisors affirmed because the plaintiff's cause of action against her former supervisors for emotional distress which was predicated upon events surrounding the decision to terminate her employment was preempted under the CSRA because termination is a covered personnel action under the Act.)

The Ninth Circuit revisited the issue of preemption of the state law tort claim of intentional infliction of emotional distress in *Saul v. United States*, 928 F.2d 829 (9th Cir.1991). In that case, the court discussed CSRA preemption in detail and explained its reason for finding the tort of intentional infliction preempted:

Both the CSRA and it legislative history show that Congress did not intend that state law tort operate within the interstices of the act. In the legislative history, Congress explicitly recognized that not every work-related complaint by a federal employee would be appealable, let alone appealable to the courts. The act itself carefully defines the interrelationships between its appeal mechanisms.... It "fully protects the existing rights of employees to trial de novo under title VII of the Civil Rights Act of 1964." ... Yet the CSRA fails even to mention state tort remedies. We infer that Congress did not mention any such remedies because it left no room for them....

We find the failure of Congress to even mention state tort remedies in the CSRA is glaringly significant. We conclude that Congress ignored these remedies because it left no room for them to operate.

928 F.2d at 842 (footnotes and citations omitted.)

Although the Sixth Circuit has not yet addressed the issue of CSRA preemption of state law common-law causes of action, it dealt with the CSRA preemption issue in the context of a *Bivens* action in *Jones v. Tennessee Valley Authority*, 948 F.2d 258 (6th Cir.1991). Noting the comprehensive nature of the CSRA statutory scheme, the court held that *Bivens* constitutional tort remedies were not available to the federal employee plaintiff. The *Jones* court explained:

The focus is on the comprehensive nature of the administrative system protecting the rights of the plaintiff, as well as Congress' expertise and authority in the field in question [i.e., the field of labor relations].

In the field of federal employment, even if no remedy at all has been provided by the CSRA, courts will not create a *Bivens* remedy.

\*   \*   \*   \*   \*   \*

The fact that plaintiff contends that Congress has denied him coverage for other kinds of personnel actions is not a ground for implying judicial relief, but rather a ground for denying judicial relief. The comprehensive nature of the CSRA indicates that congressional silence on coverage of these personnel actions was not inadvertent.

*Id.* at 264. *See also, Roth v. United States*, 952 F.2d 611 (1st Cir.1991) (over plaintiff's objection that the CSRA had no provision for damage awards, the court held that plaintiff's state law defamation claim was preempted under the statute observing, "That injured employees might be left without a means of recovering money damages is a necessary consequence of the comprehensive nature of the CSRA. Congress, in its wisdom, was fully entitled to prefer administrative enforcement to civil trials." *Id.* at 615).

It is this same deference to comprehensive administrative systems and the expertise and authority of Congress in the field of labor relations that has been the basis of judicial findings of preemption under other labor statutes, such as the Railway Labor Act, 45 U.S.C. § 151, *et seq.* (the "RLA") and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, (the "LMRA"). *See e.g., Magnuson v. Burlington Northern Inc.*, 576 F.2d 1367 (9th Cir.1978), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1979).

In *Magnuson,* the leading circuit court decision standing for the proposition that a plaintiff's characterization of his or her claim as a tort is irrelevant when a comprehensive administrative system is established under federal labor law, the court explained:

If pleading of emotional injury permitted aggrieved employees to avoid the impact of the R.L.A., *the congressional purpose of providing a comprehensive federal scheme for the settlement of employer-employee disputes in the railroad industry, without resort to the courts, would be thwarted.*

576 F.2d at 1369 (emphasis added).

■ Turning to Plaintiff's claims in this action, Plaintiff has characterized his com-

plaints in terms of state law legal theories of tortious interference and intentional infliction of emotional distress. These claims are predicated upon the following actions taken by his supervisors.

First, Mr. Risher contends that in each of his performance evaluations since his 1985–86 challenge of the "SKAP" rating system, discussed *supra*, at p. 1048 of this Opinion and Order—which were done by Defendants Hibner, Michaeli, Guerini and Paliwoda—he was downgraded in at least one element a year. Plaintiff disagrees with the negative aspects of his evaluations and feels that he did not deserve any downgrading.

Risher also complains of his 1986 transfer of Defendant Guerini's Tracks instruction group and his subsequent placement in Defendant Paliwoda's Wheels group, contending that he was transferred because he disagreed with Defendant Guerini's account of the circumstances surrounding Plaintiff's compensation claim. Plaintiff further contends that his re-transfer to Defendant Guerini's group was the result of his having challenged Defendant Paliwoda's written reprimand of him.

Plaintiff further complains of his supervisors' having required him to provide documentation for a five-day "medical" absence from work, and for his request that he be relieved of overseas travel requirements because of his mother's health.

Finally, Risher complains of not having been reimbursed for "on the job" expenditures, and not having awarded a Desert Storm "beyond the call of duty" cash award and "SMART program" monetary awards.

Preparation of performance evaluations, documentation of workers' compensation claims, reimbursement for on-the-job expenditures, disciplinary reprimands, release from travel requirements of his job, granting performance awards, determination of sick leave use, assignment of work, and monitoring work hours—such as the matters Plaintiff complains of in this action—are clearly "personnel actions" covered under § 2302 of the CSRA.

Each of these actions, or inactions, complained of by the Plaintiff arose directly out of his employment responsibilities and squarely within the context and confines of his employment relationship with his supervisors. The policies of preemption by Congressional action and the need for judicial restraint cited by the Supreme Court in *Bush* and *Fausto*, *supra*, and the appellate courts in *Broughton* and *Lehman*, *supra*, offer sound analysis and guidance for the Court in this case. In view of the extensive and comprehensive system established by Congress in the CSRA and the silence of Congress in failing to even mention the possibility of survival of state common law remedies, this Court believes that to permit such actions to exist side-by-side with the CSRA would undermine the entire basis and purpose of that Act in providing a unified, comprehensive system of employment dispute resolution.

Thus, by application of the authorities discussed above, the Court finds that Plaintiff's claims in this action are preempted under the CSRA and, therefore, the case must be dismissed.[17]

## V. *CONCLUSION*

For the reasons set forth above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Renewed Motion to Dismiss and for Summary Judgment be, and hereby is, GRANTED. Accordingly,

---

**17.** The Court's decision that Plaintiff's claims are preempted under the CSRA render it unnecessary for the Court to address Defendants' alternative bases for dismissal. However, the Court would note that even if it were to find that the CSRA did not preempt Plaintiff's claims, it appears that Plaintiff's claims are preempted under the Federal Employees' Compensation Act, 5 U.S.C. § 8101 *et seq.* ("FECA"). *See McDaniel v. United States*, 970 F.2d 194 (6th Cir.1992) (holding that a federal employee's action for negligent and intentional infliction of emotional distress by his supervisor was preempted under the FECA). *See also, Jones v. Tennessee Valley Authority, supra.* The Court finds no merit in Plaintiff's argument that the complained of actions of the supervisors did not occur "during the course of" and "within the scope of" employment. Plaintiff's own deposition testimony demonstrates the lack of merit in that argument.

IT IS FURTHER ORDERED that this case be, and hereby is, DISMISSED, in its entirety.